## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| BABU THANU CHELLEN, et al.,        ) | |
|       ) | |
|     **Plaintiffs,**    ) | |
|       ) | |
| **v.**      ) | **Case No. 02-CV-0085-CVE-FHM** |
|       ) | **(Base File)** |
| **JOHN PICKLE CO., INC., and**  ) | |
| **JOHN PICKLE, JR.,**    ) | |
|       ) | |
|     **Defendants.**   ) | |
|       ) | |

------------------------------------------------------------

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY  ) | |
| COMMISSION,     ) | |
|       ) | |
|     **Plaintiff,**   ) | |
|       ) | |
| **v.**      ) | **Case No. 02-CV-0979-CVE-FHM** |
|       ) | **(Consolidated)** |
| **JOHN PICKLE COMPANY, INC.,**  ) | |
|       ) | |
|     **Defendant.**   ) | |

VACATED

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
### (PHASE TWO)

In 2001, more than fifty men left their homes in India for work in Tulsa, Oklahoma at John

Pickle Company, Inc. ("JPC").  In 2002, fifty-two of these individuals[1] sued JPC and John Pickle,

Jr. ("John Pickle") with seven claims for relief, five of which remain:  (1) violation of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201-219; (2) race discrimination under 42 U.S.C. § 1981;

(3) deceit; (4) false imprisonment; and (5) intentional infliction of emotional distress.  The Equal

---

[1]    The Court refers to these individual plaintiffs collectively as the "Chellen plaintiffs" for first-named plaintiff Babu Thanu Chellen. The initial complaint, filed February 1, 2002, named 13 plaintiffs, including John Doe and Richard Roe.  Complaint, Dkt. # 1. The fifth and final complaint in this matter, filed July 9, 2002, names 54 plaintiffs, including John Doe and Richard Roe as unidentified plaintiffs.  Fifth Amended Complaint, Dkt. # 47.

Employment Opportunity Commission ("EEOC") subsequently brought an action against JPC for violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. § 2000e-2(a), and Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981 ("§ 1981").  Plaintiffs seek compensatory and punitive damages as well as injunctive relief.

The Court initially planned to proceed in three phases and, after a non-jury trial in the first phase, determined that the Chellen plaintiffs were employees, not trainees, under the FLSA.  See Chellen v. John Pickle Co., 344 F. Supp. 2d 1278 (N.D. Okla. 2004) (hereinafter "Chellen I").  With the agreement of the parties, the Court combined the second and third phases of the proceedings to determine liability as well as damages for all claims.  The non-jury trial for this second and final phase was held in March 2005.  The parties stipulated to representative witness testimony whereby a few individual plaintiffs testified at trial on behalf of all of the individual plaintiffs.  The parties also stipulated, among other things, that all evidence of record in the Phase I proceedings could be used in support of any claim or defense presented in Phase II of the proceedings.  Indeed, they presented overlapping evidence and argument affecting all issues, and many of the Court's earlier Findings of Fact and Conclusions of Law (Dkt. # 151) apply to the merits of the entire case.  Accordingly, the Court incorporates its prior findings and conclusions herein.

## FINDINGS OF FACT

Any conclusion of law which is more appropriately characterized as a finding of fact is incorporated herein.

**FLSA**

1.      Phase I of the trial was directed specifically at the Chellen plaintiffs' FLSA claim.  The Court set forth 57 findings of fact therein that are directly applicable to the Court's determination of

liability on this claim. See Chellen I, 344 F. Supp. 2d at 1280-91. Those findings need not be repeated in full, as defendants have stipulated that JPC did not pay the Chellen plaintiffs minimum wage as required by the labor and employment laws of the United States. Phase I Pretrial Order (Dkt. #132), Stip. III (E). Defendants have not stipulated, however, to the damages recoverable by the Chellen plaintiffs or to plaintiffs' allegation that John Pickle is individually liable for any violation of the FLSA.

2.      Defendants assert that the amounts reflected in Def. Ex. 101 accurately reflect the regular, overtime, and total hours worked by each Chellen plaintiff, as well as the actual wages paid to each worker, the minimum wage difference, the overtime difference and the gross total difference between the amount paid by JPC and the amounts owed under the FLSA to each Chellen plaintiff other than Mohammed "Hassan" Usman. Usman was not named as a plaintiff in Case No. 02-CV-85-CVE-FHM, but the EEOC apparently filed suit on his behalf in Case No. 02-CV-979-CVE-FHM. Usman settled a related claim for wages through the United States Department of Labor ("DOL").[2] The total amount set forth in Def. Ex. 101 is $86,919.48, less $2,250.13 (owed to Usman), which equals $84,669.35.

3.      Defendants contend that they are entitled to offsets for JPC's expenditures for the Chellen plaintiffs' housing, food, medical needs, and telephone calls. Defendants offered the testimony of

---

[2]      The EEOC points out that, while the pay rate for most of the plaintiffs ranged from $2.89 to $3.17 per hour, see Chellen I, 344 F. Supp. 2d at 1282 (FOF ¶ 11), the rate for the two cooks was considerably less. The cooks claim to have worked approximately 18 hours per day, 7 days per week, at a salary of $500 per month. Phase II Trial Transcript, Dkt. ## 189-96 (hereinafter referred to as "Ph. II Tr.") at 36-37, 40-42, 67, 69. Therefore, the hourly rate paid to them would have been less than $1.00 per hour. However, the EEOC has no FLSA claim, and the differential in wages is subsumed in the EEOC's Title VII claim for damages. The EEOC does not claim damages for Usman, but it does claim damages for Toofan Mondal, the other cook hired by defendants to work at JPC.

Christina Pickle, wife of defendant John Pickle, as to the costs incurred by defendants for housing and other items for which defendants seek credit. Ph. II Tr. at 879-82. For lodging, the defendants seek $4.50 per plaintiff per day, for a total of $23,679.00. Def. Ex. 62-E-2. Defendants seek a total of $16,011.81 as an offset for food, Def. Ex. 62-D-2; $8,062.62 for medical expenses, Def. Ex. 62-F-2; and $2,177.24 for telephone expenses, Def. Ex. 62-G-2. Although defendants initially sought credits for travel and transportation costs as well as uniforms and tools, they have abandoned those requests. See Def. Prop. Findings and Conclusions, Dkt. # 199, at 3-4. Therefore, the total amount of credit sought by the defendants is $49,930.67.

4.      The EEOC's expert witness testified that offsets for housing against FLSA wages are allowed to an employer where the benefit is primarily to the employee as opposed to the employer. If allowed, an offset for housing is calculated as (a) the cost of the structure divided by the number of employees; (b) the fair value of the housing; or (c) the reasonable value charged by the employer. Ph. II Tr. at 926. However, the expert concluded that the costs for housing provided by defendants to the Chellen plaintiffs should not offset the minimum and overtime wages owed. He reasoned that: living conditions in the dormitory were sub-standard; the Chellen plaintiffs did not use the facility voluntarily; and the defendants used an arbitrary "rental" cost in calculating what they argued was a fair market value for the housing. Ph. II Tr. at 924-28. The Court finds that JPC and John Pickle are not entitled to an offset for housing.

5.      Plaintiffs argue that defendants' request for an offset for food is unconscionable, given the limited quantity and poor quality of the food provided by defendants to the Chellen plaintiffs. However, the Chellen plaintiffs were fed three meals per day. The Court finds that JPC and John Pickle are entitled to an offset for food. The EEOC concedes that a credit for medical treatment

provided to the Chellen plaintiffs would be appropriate, and the Court finds it an appropriate offset. Finally, the Court finds that an offset for telephone expenses is appropriate.

6.      The Chellen plaintiffs argue, for purposes of recovering liquidated damages, that the following facts give rise to a finding that defendants' violation of the law was willful and not in good faith:  defendants sought "cheap labor," as stated by John Pickle, see Chellen I, 344 F. Supp. 2d at 1280 (FOF ¶ 1), 1290 (FOF ¶ 2); defendants knowingly obtained improper visas for defendants, see id. at 1282 (FOF ¶ 10), 1289 (FOF ¶ 48), 1290 (FOF ¶ 52), 1291 (FOF ¶ 57); defendants misrepresented to U.S. officials that the Chellen plaintiffs would be part of a "training" program, id. at 1281 (FOF ¶ 6), 1285 (FOF ¶ 28), 1289 (FOF ¶ 49); defendants backdated employee evaluations in an effort to prove that the Chellen plaintiffs were "trainees," id. at 1284 (FOF ¶ 23), 1288 (FOF ¶ 40); and defendants routed wages to the Chellen plaintiffs through defendants' Indian recruitment agent, AL Samit International ("AL Samit"), id. at 1282-83 (FOF ¶¶ 12, 13), 1290 (FOF ¶ 52).  John Pickle directly participated in the creation and execution of the plan to bring the plaintiffs to Oklahoma. Id. at 1280 (FOF ¶ 1), 1281 (FOF ¶ 7), 1287 (FOF ¶ 38), 1290 (FOF ¶ 52). The Court finds that John Pickle is personally liable for violation of FLSA.  The Court further finds that an award of liquidated damage under the FLSA, equal to the amount of wages owed, is appropriate as against both defendants.

7.      Given the Court's findings of fact as to the parties' wage stipulations, the Court concludes that all of the Chellen plaintiffs other than Mohammed "Hassan" Usman, who settled his wage claim through the DOL, are entitled to compensatory damages in an amount equal to the gross total difference between the amount paid by JPC and the amounts owed under the FLSA to each Chellen plaintiff (other than Usman), less offsets itemized in Jt. Ex. 2 for expenses related to food, medical

5

needs, and telephone expenses.  The total amount is $86,919.48 less $2,250.13 (owed to Usman), or $84,669.35, less $26,251.67 (offsets), for a total amount of $58,417.68, plus an equal amount of liquidated damages.

### Civil Rights (Title VII and § 1981)

8.     Each of the Chellen plaintiffs is a citizen of India.  Defendants dispute that the Chellen plaintiffs' race differs from their own; defendants do not dispute that the Chellen plaintiffs' national origin is East Indian.  The EEOC asserts that the race of the Chellen plaintiffs is Asian; defendants assert that no evidence was presented to show that the Chellen plaintiffs are of a race other than the Caucasian race.  The Chellen plaintiffs do not specify their race but simply state that they are citizens of India and that "white," "American" employees at JPC received different treatment.  See Pl. Proposed Findings and Conclusions, Dkt. # 200, at 32-36.  The Court finds it unnecessary to make a determination of the Chellen plaintiffs' race, given its findings and conclusions based on the Chellen plaintiffs' national origin, ethnicity, and culture.

### Disparate Treatment

### Wages

9.     The Chellen plaintiffs were qualified for the jobs for which they were recruited, tested, transported, and employed and which, ultimately, they performed at JPC.  See Chellen I, 344 F. Supp. 2d at 1288-89 (FOF ¶¶ 43-46).  The Chellen plaintiffs who worked as welders, fitters, roll/break operators, and electrical maintenance workers were paid less than their non-Indian JPC counterparts who had similar skills, abilities, and job duties.  See Pl. Ex. 62B; Ph. II Tr. at 827-29. JPC did not employ any non-Indian cooks.

### Testing

10.     The Court's prior findings detail the testing requirements for the Chellen plaintiffs in comparison with non-Indian JPC employees.  See Chellen I, 344 F. Supp. 2d at 1283-84 (FOF ¶¶ 17-19).  In short, JPC required all the Chellen plaintiffs to pass skill tests in India before they were hired, and the welders were required to pass a second test when they arrived at JPC in the United States.  JPC required its non-Indian welders to pass only one test before hire, and it did not consistently require fitters to pass a skill test.

### Classifications

11.     Unlike their practice for new hires of non-Indians, JPC managers did not view the test results, qualification documents, certifications, or employment histories of the Chellen plaintiffs before assigning them a classification upon which to base their pay.  Chellen I, 34 F. Supp. 2d at 1283 (FOF ¶ 14).  Although the record is unclear on this point, it appears that JPC managers initially assigned most of the Chellen plaintiffs an entry level "C" classification, although some may have received a "B" classification.  Id. (FOF ¶ 15); Pl. Ex. 66.  None received an "A" classification.

12.     Near the end of the time the Chellen plaintiffs were at JPC, JPC managers evaluated and re-classified several of the Chellen plaintiffs, but the Chellen plaintiffs were unaware of these evaluations or reclassifications until the lawsuit was filed. Id. at 1284 (FOF ¶¶ 23-24), 1288 (FOF ¶ 40); see Def. Exs. 22G, 26G; Pl. Ex. 66.  JPC did not offer the Chellen plaintiffs the same opportunities it offered its non-Indian employees for evaluation, self-assessment, and re-classification for pay increases related to performance.

**Job Assignments**

13.     JPC required the Indian employees to perform jobs such as grinding welds, painting, sandblasting, and insulating, as well as janitorial duties, kitchen duties, and yard work unrelated to the skills for which the Chellen plaintiffs were hired.  See Chellen I, 344 F. Supp. 2d at 1284 (FOF ¶ 21), 1286 (FOF ¶ 32).  The Chellen plaintiffs did not view these jobs as desirable or part of their employment responsibilities.  Prior to the arrival of the Chellen plaintiffs, these jobs were performed either by the least skilled and lowest ranking non-Indian JPC employees or not at all.  Id.; see Phase I Trial Transcript, entered Jan. 20, 2004 (hereinafter referred to as "Ph. I Tr.") at 389-92, 622-23, 1150-52, 1180-81; Ph. II Tr. at 215-16, 593-94.

14.     Five of the Chellen plaintiffs were also required to assist in the replacement of a septic tank.  The septic tank was attached to a small house which served as the Chellen plaintiffs' original quarters.  Replacement of the tank was required because of JPC's failure to anticipate and prepare for the use of the bathroom by more than 30 men.  See Ph. II Tr. at 340, 532-33, 542-43, 780-82.  In addition, JPC required the Chellen plaintiffs to work on the conversion of a building at the JPC facility into a dormitory.  Chellen I, 344 F. Supp. 2d at 1284 (FOF ¶ 21), 1285 (FOF ¶ 29).  Similarly-situated JPC non-Indian employees were not required to perform the job assignments considered by the Chellen plaintiffs to be undesirable.  See Ph. I Tr. at 622-23, 865, 989-92, 1176-77;  Ph. II Tr. at 98-101, 110, 184-85, 208, 287-94, 334-36, 532-33, 542-43, 588-90, 611, 629-30, 662, 773-74, 780-82.

## Restrictions

15.     JPC restricted the Chellen plaintiffs' movement, communications, privacy, worship, and access to health care.  No similar restrictions were placed on JPC's non-Indian employees.  Many of the facts applicable to this comparison are also relevant to the Chellen plaintiffs' tort claims.

16.     As set forth in the Court's prior findings and conclusions, immediately upon the Chellen plaintiffs' arrival in Tulsa, defendants placed the Chellen plaintiffs' passports, visas, return-trip airline tickets, and I-94 Forms in a safe to which the Chellen plaintiffs had no access.  Chellen I, 344 F. Supp. 2d at 1282 (FOF ¶ 11).  Defendants denied access to the documents even when the Chellen plaintiffs requested it in writing.  Pl. Ex. 46; Ph. II Tr. at 330-31, 636, 677-78.  JPC ultimately refused to release the passports and visas of the Chellen plaintiffs until the Court ordered the release soon after the lawsuit was filed.  See Minutes, Dkt. # 6.

17.     JPC restricted the Chellen plaintiffs' ability to leave JPC in several other ways, as set forth in the Court's prior findings and conclusions.  See Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 31).  JPC employee Sharon Sartain provided transportation to the Chellen plaintiffs at her convenience in a small bus that could transport only 17 persons at a time.  Ph. II Tr. at 771-72, 960-61, 965-66, 978.

18.     Defendants point out that Sharon Sartin provided transportation to Catholic churches, Hindu temples and Islamic mosques. Ph. II Tr. at 427, 570, 956-58, 963-64.  Further, some of the Chellen plaintiffs used the pedestrian gate that led into Sharon Sartin's yard to walk to a local church. Ph. I Tr. at 346, 956-57.  One admitted that he used public bus transportation to look for other work in Tulsa.  See Ph. II Tr. at 130-31.  Another testified that he used other forms of public transportation for a trip to New York.  Ph. II Tr. at 229-30.

19.     The Chellen plaintiffs testified that, in some instances, friends or family had to provide significant personal information to "check them out" for short visits off the JPC premises.  Id. at 306-07, 466-67, 588.  Defendants initially told the Chellen plaintiffs that, if they left JPC premises, they might be harmed by Americans who were angry about the September 11, 2001 terrorist attacks and further, that black residents of the surrounding area were dangerous and could shoot them.  Ph. II Tr. at 295, 448, 581, 601, 637-38, 659, 979.  Later, defendants told the Chellen plaintiffs that, if the Chellen plaintiffs left the premises without permission, they would be reported to law enforcement authorities and jailed.  Ph. I. Tr. at 1102-04; Ph. II Tr. at 102, 187, 189, 202, 301-02, 461-62, 498, 632-33.

20.     Eventually, an armed guard was hired to prevent "unauthorized departures" by the Chellen plaintiffs from the facility.  See Ph. II Tr. at 203-04, 452, 502, 522-23, 585-86, 777, 785-86.  The main gates at the JPC were locked over the Thanksgiving holiday.  Ph. I Tr. at 375, 486; Ph. II Tr. at 446-48, 451, 966.  Two plaintiffs testified that, on one occasion, their dormitory door was chained shut during the night and the guard was posted outside the door. Id. at 452-55, 491-92, 778-80, 822-23.[3]  One Chellen plaintiff testified that, on one occasion when he left the property unaccompanied, he was picked up, admonished, and returned to the facility.  Id. at 86-87.  Several Chellen plaintiffs who left the facility unauthorized were labeled "runners" on JPC timecards.  See Pl. Exs. 31A(1), 31A(2).  At least one plaintiff left his personal belongings behind when he departed. Ph. II Tr. at 615.  Trial testimony implicated John Pickle as stating, with regard to one of the plaintiffs who left

---

[3]     Defendants dispute this testimony, arguing that there was no method by which the main door could be locked or secured by a chain or otherwise, but they cite to no evidence other than unidentified photographs in support of this argument.  See Def. Proposed Findings and Conclusions, Dkt. # 199, at 11-12.

JPC after using without permission and causing damage to a company truck, "Even if he is hiding underground, I'll pull him up by his hair and bring him to justice. And I am an American, I would be able to do that." Id. at 109.

21.     Defendants also monitored the Chellen plaintiffs' off-duty computer Internet activity and e-mail communications in an effort to enforce the unauthorized leave policy. Ph. II Tr. at 307-08, 591-92, 771. The Court previously found that defendants recorded some of the Chellen plaintiffs' telephone conversations without their knowledge. Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 31); Ph. II Tr. at 308, 592. Further, JPC required the Chellen plaintiffs to sign "Personal Conduct Agreements" by which they agreed that they would not "place any phone calls, e-mails, or have any other communication . . ." to plan or aid unauthorized leave from JPC. Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 32); e.g., Def. Exs. 21K, 30H, 31V, 32V, 39R.

22.     Defendants paid four of the Chellen plaintiffs extra money to be "leadmen," whose primary responsibilities were to watch over the other Chellen plaintiffs and report to JPC managers any "unauthorized" activities outside the facility. See Chellen II, 344 F. Supp. 2d at 1286 (FOF ¶ 31); Ph. II Tr. at 149-50, 183-84, 468, 561-63; Def. Exs. 19H, 22H, 31N, 45Q. Prior to Thanksgiving, John Pickle gave one of the leadmen, Marshall Suares, the keys to the locked gates and specifically instructed him not to allow anyone out of the dormitory on Thanksgiving. Ph. II Tr. at 448. Suares followed that instruction. Id. at 451. Some of the plaintiffs nonetheless crawled through a drainage ditch and under the barbed wire perimeter fence of the JPC premises. Ph. I Tr. at 487, 776; see Ph. II Tr. at 966.

23.     John Pickle had the "leadmen" read an email authored by Ray Murzello, an Indian who served as JPC's principal recruiter and Director of Marketing. The email contains the threat of

deportation for two Chellen plaintiffs identified by defendants as "troublemakers" or potential "runaways." Pl. Ex. 40; Ph. II Tr. at 188-92, 237-38, 665-66; see Ph. I Tr. at 1101-02. The Court has already detailed what could be described as an attempt at a "forced deportation" for seven other Chellen plaintiffs. Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 33).

24.     In Phase II of the trial, defendants presented the testimony of Captain Bill Bass, a member of the Tulsa County Sheriff's Department. He testified that he arrived at JCP when the Chellen plaintiffs were getting on the bus for their departure back to India, and he saw no indication of a disturbance or any attitude of resistance by the plaintiffs Ph. II Tr. at 736-38, 740-41, 751-52. He did follow the bus to the bank, and then to the airport. Id. at 738-43.

25.     Plaintiffs considered the presence of the police officers intimidating. Id. at 214-15, 474-75, 802-08. Further, part of the event included unnecessary physical intimidation, invasion of privacy while the "deportees" dressed, showered, and used the bathroom, and a prohibition on communications between the co-workers. Ph. II Tr. at 93-96, 214-15, 308-09, 473-76, 595-96, 798-809. John Pickle personally participated in the attempted deportation. Id. 95, 214, 801-03; see Ph. I Tr. at 396-97.

26.     Defendants' restrictions on movement of the Chellen plaintiffs affected the Chellen plaintiffs' ability to worship freely. Although all of the men were from India, they had different languages, diets, and faiths. Some were Hindu, others Christian, and a few were Muslim. The first Chellen plaintiffs to arrive at JPC testified that defendants, and John Pickle in particular, would not permit them to attend church services regularly, although eventually they were permitted to go. Ph. II Tr. at 87-89, 303-06, 463-65, 633. When one Catholic member of the second group to arrive asked to go to church, John Pickle questioned him as to whether he actually believed in God before

acceding to his request.  Id. at 463.  When another Chellen plaintiff asked to go to church, Pickle told him that he should just stay in the dorm and watch the Playboy channel.  Id. at 303-04, 633.

27.    The Chellen plaintiffs who were Catholic testified that defendants eventually permitted Sharon Sartin to transport them to Mass.  E.g., id. at 324.   However, they were required to immediately report back to the bus after Mass for return to the JPC facility.  This constraint left no time for them to speak with priests or parishioners.  Ph. II Tr. at 305-06, 463-64, 633.  On one occasion when they were delayed in returning to the JPC facility after Mass, John Pickle became very angry.  Id. at 600, 984-85.  When the Hindu Chellen plaintiffs realized that their worship opportunities would be similarly limited, they built themselves a small personal shrine in a makeshift cabinet for worshiping in the warehouse.  See Ph. II Tr. at 567-68;  Def. Ex. 58T.

28.    John Pickle also discouraged the Chellen plaintiffs from attending church by telling them that the Christian or "church" people who reached out to them were breaking the law and would be "punished," or jailed.  Ph. II Tr. at 212, 303, 598-99, 633.  Defendants initially refused to allow the Chellen plaintiffs to observe Christmas as they wished.   See id. at 88-89, 306-07, 464-67.  Defendants offered to drive the men to see Christmas lights, but only a few men at a time could fit on the small bus.  Id. at 772, 978.  Marshall Suares was able to convince defendants to permit plaintiffs to go to church, and to visit with friends or family over the 2001 Christmas holiday after promising to be personally responsible for the men who left and taking personal information from the people whom they would visit.  Id. at 306-07, 465-67.  Defendants argue that three of the nine plaintiffs who testified made arrangements with JPC employees to attend Thanksgiving dinners and bicycle races off the JPC premises.

29.     Some of the men were able to attend a nearby Pentecostal church and met Mark Massey, a man who would assist with their final departure from the JPC premises.  Ph. II Tr. at 212, 346-47, 598-99, 606, 667-70, 677-79.  On February 5, 2002, plaintiff and leadman Marshall Suares testified that he called Massey, who came to the JPC premises with three or four vehicles and a local television station cameraman.  Suares testified that, when the Chellen plaintiffs began entering the vehicles, Joe Reeble raised his hands and shouted: "Stop, stop!  You are on private property.  You are not supposed to take my men.  Leave them here."  Id. at 485-86, 680.  Reeble followed the vehicles to Massey's house and parked his vehicle in front of the house.  Id.

30.     Finally, defendants restricted the Chellen plaintiffs' access to health care.  The Court previously found that defendants were inattentive to the medical needs of the Chellen plaintiffs and carried no workers' compensation or health insurance for them.  Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 30).  Testimony in Phase II of the proceedings demonstrated that defendants made arrangements for a few of the Chellen plaintiffs to obtain medical or dental care, but denied the requests of others.  Ph. II Tr. at 102-03, 502-04, 634-36, 775-76, 784-86.  John Pickle and other JPC officials made comments indicating that they viewed the Chellen plaintiffs' health issues as minor matters or hypochondria.  Ph. I Tr. at 353-54, 362-65, 894-95.  There was no evidence indicating that defendants limited the access of non-Indian JPC employees to health care.  See Ph. II Tr. at 830-34 (discussing health plan and sick leave policy for non-Indian JPC employees).

## Living Conditions

31.     Many of the facts applicable to the comparison in living conditions are more relevant to the Chellen plaintiffs' tort claims, but consideration of these conditions goes to the amount, if any, of offset for the wages awarded to the Chellen plaintiffs as damages.  Defendants did not require the

non-Indian JPC employees to live at the JPC facility. Hence, the non-Indian JPC employees were not subjected to the same substandard living conditions as the Chellen plaintiffs. The Court described some of these conditions in its prior findings. Chellen I, 344 F. Supp. 2d at 1285-86 (FOF ¶¶ 29-30).

32.     Defendants describe the converted warehouse and office space as including a room with living room furniture, a large color television, two computers with Internet access, and places for hanging work uniforms and storing work boots. See generally Def. Exs. 58A-58GG. There was also a second large room, in which some of the plaintiffs slept in bunk beds, which contained tables and equipment to make tea, coffee and other beverages. All of the other rooms in which plaintiffs slept were individual rooms with either doors or partitions. In addition, a modern bathroom facility in the building contained 16 lavatories, 8 showers, and two washers and dryers which were supplied by three 100 gallon sequentially firing hot water heaters. The building also had toilets that had been specifically modified to include a hand-held hose for washing. The dormitory had windows which could be opened, doors which could be opened to provide ingress and egress, and a suitable heating and ventilation system. Id.

33.     Contrary to defendants' description, the Chellen plaintiffs described the dormitory in which they lived as similar to a "refugee camp" or place to house displaced persons after a "disaster." Ph. II Tr. at 283-84; see generally Pl. Ex. 22 (photo of dorm); Pl. Ex. 50 (videotape). Some of the mattresses on which they slept were obtained by JPC from a salvage store and their beds were assigned by number pursuant to a lottery. Id. at 183, 581-82, 660-61, 870, 874; Def. Ex. 62E-13, at 98, 108. The warehouse dormitory, with its concrete floors and partial walls, was noisy and uncomfortable with no place for personal belongings. Id. at 175, 178. Several Chellen plaintiffs

described their inability to obtain proper rest because of the openness of the building and the disturbances resulting from the arrival and departure of day and night shift crews.  See Ph. II Tr. at 175-76, 331-32, 559, 582-83, 610, 660-61; see generally Def. Exs. 58A-58GG.  Two of the Chellen plaintiffs testified that they were exposed to radiation from a machine in the manufacturing building located within inches of the exterior wall of the dormitory.  Ph. II Tr. at 174-75, 559.   The cooks were required to live in a small room adjacent to the kitchen because of the approximately 18 hours of work they were required to perform each day.  Ph. II Tr. at 64, 67-68. The Chellen plaintiffs complained about their assigned quarters and did not choose to live there voluntarily.

34.   The Chellen plaintiffs also complained about the nature, quantity, and quality of the food provided to them by defendants.  Again, there is no evidence that JPC furnished its non-Indian employees with food, but these facts are relevant to the offsets, if any, for the wages to which the Chellen plaintiffs are entitled, as well as any punitive damages awarded.  While the non-Indian JPC workers were compensated at a rate of pay that would allow them to feed themselves, JPC deducted from the Chellen plaintiffs' paychecks fifty dollars per month for food.  Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 30).

35.   John Pickle essentially admitted to rationing food for the Chellen plaintiffs.  Ph. I Tr. at 317-19. One plaintiff testified that John Pickle would sometimes sit down next to the Chellen plaintiffs while they were eating and say "Do you eat this much food in India?"  Ph. II Tr. at 284, 628.  The Chellen plaintiffs rejected a statement by Ray Murzello, who stated that the food at JPC's facility was better than what they had in India, where they were starving, at least according to Murzello. Ph. II Tr. at 60-61.  A representative of the company that provided food ordered by JPC for the Chellen plaintiffs testified to the quantity of food ordered by JPC.  That quantity was based on a

representation by John Pickle that he needed to feed 25-30 men, and that allocation did not change over time.  Id. at 718, 720-21.

36.     The Chellen plaintiffs complained particularly of the lack of milk, which was a dietary concern for a number of the Hindu workers who were vegetarian. Ph. II Tr. at 115-16, 173-74, 559-61.  On one occasion, John Holcomb, JPC's Manufacturing Support Manager, served the milk himself to ensure that each Chellen plaintiff received only one small glass during mealtime.  Id.  at 55.  On another occasion, John Pickle responded to a request for milk by dipping a piece of bread in a cup of water and said, "If I can eat this, you can also eat it."  Id. at 560.  Despite his knowledge of the dietary concerns of certain Chellen plaintiffs, he continued to restrict the quantity of milk provided.  Ph. I. Tr. at 482-83.

37.     One of the two cooks among the Chellen plaintiffs testified that he was provided with inadequate cooking utensils and facilities.  Ph. II Tr. at 48, 53, 83.  He testified that he was even made to serve rotten apples, although a visit by health inspectors subsequently led to a disposal of large quantities of food and utensils.  Id. at 57-59.  He tried to fashion the American food provided to him into food that would be more palatable to the men who were accustomed to the cultural and religious diets of India, as the Muslim workers could not eat pork, the Hindu workers could not eat beef, and the vegetarians could not eat meat or eggs.  Id. at 115-16.

### Hostile Work Environment

38.     The conduct of JPC employees and John Pickle subjected the Chellen plaintiffs to harassment in the nature of a hostile work environment characterized by abusive language, demeaning job assignments, and threats and intimidation based on their national origin.  Chellen plaintiff Jagdish Prajapati testified that he was at the private property of John Pickle when John

Pickle's grandson was also present, and John Pickle stated to his grandson, "These are my Indian animals I brought from India to work." Ph. II Tr. at 519.  Prajapati also stated that his first supervisor used obscene language in reference to the Indians, and, although Prajapati complained to John Pickle, nothing was done to stop the conduct. Id. at 520-21.  Chellen plaintiff U.C. Patel testified that John Pickle once stated, "bloody Indians work here and live here." Id. at 558.

39.     Two of the Chellen plaintiffs testified that John Pickle called them his "Indian dogs." Ph. II Tr. at 601-02, 686-87.  The cook, Toofan Mondal, told of an occasion when John Pickle came into the kitchen with Ray Murzello's son, who was Indian.  John Pickle called the boy over, referring to him as an "Indian dog," and called to the boy like a puppy. Id. at 105.  George Panackalpuracal recalled a meeting at which John Pickle called the Chellen plaintiffs "dirty" and accused them of unsanitary practices. Id. at 638-39.

40.     Chellen plaintiff Bharathakumaran Nair testified that, when he complained about doing janitorial work, John Holcomb followed him to his room, repeatedly called him "lazy," and threatened to send him back to India. Ph. I Tr. at 705-08.  Nair stated that Holcomb specifically said, "[T]his is why Americans say that Indians are lazy people." Id. at 708.  According to Nair, Holcomb raised his arm as if to strike Nair. Id. at 708-09.  Another Chellen plaintiff testified that he witnessed Holcomb yelling at Nair, suspending him from work for the day, sending him to his room, and calling him a "lazy Indian." Ph. II Tr. at 293.  On another occasion, Holcomb raised a chair over his head, threatened to hit one of the Chellen plaintiffs with it, and beat it against the floor as he verbally berated plaintiff Himanshu Patel. Ph. II. Tr. at 500-01, 563-64.

41.     In one incident, John Holcomb called a few of the Chellen plaintiffs into the office of JPC's vice president and chief operating officer, Joe Reeble, to discuss some of the Chellen plaintiffs'

complaints. Ph. II Tr. at 195-97, 459-61.  In the meeting, Reeble called Gulam Peshimam, the owner

of AL Samit.[4]  When Reeble described the problems to Peshimam, Peshimam proposed that JPC

managers beat the Chellen plaintiffs and "break their damn legs."  Ph. I Tr. at 126.  Reeble testified

that it was just a joke and he laughed.  Id.  Two of the Chellen plaintiffs testified at the second phase

of the proceedings that, when Reeble laughed, he also said "not a bad idea."  Ph. II Tr. at 197, 461.

42.     The threat of deportation was especially significant in defendants' creation of a hostile

working environment.  The Chellen plaintiffs feared Gulam Peshimam and the harm he could inflict

on themselves or their families if they were made to return to India. E.g., Ph. II Tr. at 138, 190-97,

462, 816.  As set forth in the Court's prior findings, many of these plaintiffs left good jobs or their

own successful businesses, and some obtained loans from family and friends to pay large "fees"

required by AL Samit.  Chellen I, 344 F. Supp. 2d at 1281 (FOF ¶ 4.)  They had debts to repay, and

they believed that a vindictive Gulam Peshimam would seek retribution and make it impossible for

them to return to their former jobs and businesses or obtain other work to repay their debts.

43.     Chellen plaintiff Jeron Peter testified that he was called to the office of John Holcomb, and

Ray Murzello was also present.   After Holcomb reviewed a list of Peter's faults, Peter asked

Murzello why he was being treated in that manner.  Murzello responded:  "You are an Indian.  That

is why they treat you this way, and that is all you expect here because they don't like Indians."  Ph.

II Tr. at 333.  Peter testified that Holcomb often called him into the office and stated:  "I don't like

---

[4]     As set forth in the Court's prior findings, JPC contracted with AL Samit to recruit, pre-
        screen, and arrange for testing of the Chellen plaintiffs and others in India.  Chellen I, 344
        F. Supp. 2d at 1280 (FOF ¶ 3).   Later, defendants paid AL Samit a "marketing fee" or
        "commission" in an amount sufficient to reimburse AL Samit for AL Samit's payment of the
        Chellen plaintiffs' salaries while they were at the JPC facility in Tulsa.  Id. at 1282 (FOF ¶
        12).  The Court held that AL Samit was JPC's agent.  Id. at 1290 (FOF ¶ 53).

Indian guys.  I'm going to send you back to India."  Id. at 334.  On one occasion, Peter and an

American fitter were in Holcomb's office with Chellen plaintiff Baburajan Pillai.  Holcomb shouted

at Peter and called him lazy.  Id. at 338.  The American fitter said to Holcomb, "[H]e's an Indian.

He's no good.  And, you know, we'll send him back."  Id. at 339. Peter also testified that Holcomb

and Dale Chasteen, JPC's Director of Manufacturing, called him a "fucking Indian."  Id.

44.     At a meeting called after one of the Chellen plaintiffs had damaged a company truck, JPC

managers and John Pickle verbally abused the Chellen plaintiffs by calling them "Indian bastards,"

"fucking bastards," "fucking Indians," and "sons of bitches." Ph. II Tr. at 106-09, 198-200, 455-57,

497-98.  Dale Chasteen, JPC's Director of Manufacturing, went into a tirade, cursing at the Chellen

plaintiffs, implying that they had no jobs in India and were starving there when John Pickle hired

them, and stating that "Americans, we know what to do, how to deal with guys like you."  Ray

Murzello's wife, who was interpreting for the Indians at the meeting, began to cry.  Id. at 456-57.

Expert witness Florence Burke confirmed that, in private interviews, many of the Chellen plaintiffs

told her of the names they were called at the JPC facility, such as "52 Indian donkeys," "dirty

Indian," "Indian bastard."  Id. at 406-07.

45.     At a meeting in January 2002, JPC managers told the Chellen plaintiffs that, by American

laws or rules,  they were required to perform any tasks they were asked to do, including any and all

cleaning or undesirable tasks. Ph. II Tr. at 110, 184-86, 291-93, 588-90, 670-71. JPC managers then

asked the Chellen plaintiffs who refused to agree to this demand to move to another side of the

room, and all but three or four moved.  Id.  John Holcomb reacted later by spitting on the floor when

the Chellen plaintiffs attempted to greet him.  Id. at 294, 591.  Holcomb also threatened one of the

leadmen with demotion as a result of the leadman's failure to agree to the tasks.  Id. at 186.

### Damages

### Compensatory

46.     The parties have stipulated to various elements relevant to an award of compensatory damages under Title VII and § 1981.  See Ph. II Pre-Trial Order, Dkt. # 178.  These include: the number of days worked by each Chellen plaintiff for JPC per month, as reflected in Def. Ex. 62C; the number of regular and overtime hours worked for JPC by each Chellen plaintiff (with the exception of the cooks), Def. Ex. 76; the amount of money paid by the Chellen plaintiffs to AL Samit during the recruitment process, Def. Ex. 77; and the average hourly rate of pay for the non-Indian JPC employees in 2001 and 2002, as calculated by job position and classification within each position, Pl. Ex. 62B.  The parties disagree, however, on the classifications and, thus, the pay rate, merited by each of the Chellen plaintiffs.

47.     Defendants have submitted wage classifications and calculations based upon evaluations by JPC managers of the Chellen plaintiffs near the end of the Chellen plaintiffs' time at JPC.  The evaluations resulted in a scores from 1-5.  For purposes of trial, JPC's counsel arbitrarily assigned each evaluated plaintiff a classification based upon his score.  Those employees scoring 3.5 or below were assigned a "C" classification; those scoring 3.5 to 4.5 were assigned a "B" classification; and those scoring 4.5 or higher were assigned an "A" classification.  Id. at C-2.  Defendants assert that the cooks and six other plaintiffs were not evaluated, and one additional plaintiff was not given a classification.  See Def. Prop. Findings and Conclusions, Dkt. # 199, Ex. C-2.  JPC arbitrarily assigned one plaintiff a "C" classification, one an "A" classification, and five were assigned a "B" classification.  JPC assigned no classification for the two cooks (JPC ## 129, 130), and did not include them on the accompanying wage classification calculations.  Id., Ex. C-3.

48.     The Court finds the basis for defendants' classifications unsound.  As set forth in the Court's prior findings, the evaluation forms were created in a belated effort to give the appearance of a legitimate training program, although they did confirm that the Chellen plaintiffs performed at a level required of JPC's regular employees. Chellen I, 344 F. Supp. 2d at 1284-85 (FOF ¶¶ 23-24), 1288 (FOF ¶ 40).  Further examination of the evaluation forms indicates that the plaintiffs were evaluated by six or seven JPC managers or supervisors. Pl. Ex. 66; Def. Exs. 1G-48G.  Some evaluators consistently gave high scores while others consistently gave low scores.  Classifications are actually indicated on many of the evaluation forms, and the classifications generally do not correspond to the scores.  For example, welder Poulose Maleril Varkey (JPC # 116) was designated "B Class" although his score was only 1.8.  Def. Ex. 16G.  U.C. Patel (JPC # 119) earned a 3.4 score but received a "C" classification.  Def. Ex. 19G.  Bala Raju Salupa (JPC # 122) received an "A" classification even though he had a 2.8 score.  Def. Ex. 22G.

49.     The EEOC urges the Court to assign each of the Chellen plaintiffs a classification of "A" given the Court's prior findings as to the qualifications, skills, and experience of the group as a whole, Chellen I, 344 F. Supp. 2d at 1281 (FOF ¶ 5), 1288 (FOF ¶¶ 43, 44), as well as the quality of their work while they were at JPC, id. at 1284 (FOF ¶ 20), 1285 (FOF ¶¶ 24, 28), 1288-89 (FOF ¶¶ 45, 47), and the pay earned by many of the representative witnesses in similar employment after they left JPC, id. at 1287 (FOF ¶¶ 36, 37), 1289  (FOF ¶ 46); Ph. II Tr. at 30-31, 156-57, 274-75, 329-30, 432-33, 495, 512-13, 557-58, 579-80, 610, 627, 654; Ph. I. Tr. at 710-14.  The Court previously acknowledged the inconsistency between JPC's classification of the Chellen plaintiffs and JPC's classification of non-Indian JPC employees.  See Chellen I, 344 F. Supp. 2d at 1283-84 (FOF ¶¶ 15, 18-19).  Given the lack of reliable evidence as to each individual plaintiff, and the

overwhelming evidence regarding the group as a whole, the Court finds that a classification of "A" is appropriate.

50.     The  EEOC also urges the Court to find that four of the five men who were designated as "leadmen" by JPC managers deserve to be paid the same as the non-Indian JPC leadmen.  Four of the five plaintiff leadmen signed a "Personal Agreement" on December 19, 2001 which references the same job descriptions as agreements with JPC leadmen who were not from India.  E.g., Ex. 19H; 22H; 31N; 45Q; Ph. I Tr. at 105-10.  These agreements show that the plaintiff leadmen were to receive additional $100 per month, separate quarters, different uniforms, and free food in the JPC cafeteria.  Holcomb referred to the leadman who did not sign a personal agreement as a "dormitory leadman." Ph. I Tr. at 1128-29.

51.     The evidence is not persuasive that any of these leadmen actually performed the same duties as the non-Indian JPC leadmen.  Instead, it indicates that the defendants recruited these five Chellen plaintiffs to assist JPC managers in controlling and containing the other Chellen plaintiffs and reporting their activities.  See Chellen I, 344 F. Supp. 2d at 1286 (FOF ¶ 31); Ph. I Tr. at 105-10. One leadman specifically testified that he knew the duties of a lead man, but he did not do that work. Ph. II Tr. at 149-50.  Instead, he was responsible for organizing the dormitory, taking complaints, explaining the work, and reporting any plans by other Chellen plaintiffs to leave JPC.  Id. at 150.  Accordingly, the Court finds that the five Chellen plaintiff "leadmen" were not entitled to "leadman" pay commensurate with that received by non-Indian JPC leadmen.

52.     The plaintiffs hired by JPC to cook for the other Chellen plaintiffs were not "classified" in the same manner as the other JPC employees and there were no cooks at JPC with whom they could be compared for purposes of determining an appropriate hourly wage.  As set forth above, one of

these two cooks settled a wage claim with the DOL.  The EEOC proposes for the other cook, Toofan Mondal, that he be paid at the rate of pay that approximates (1) what he earned at his first job after JPC ($2,200 per month) in salary exclusive of room and board, and (2) at a rate that is reasonably situated among JPC pay levels, see Pl. Ex. 62B.  Assuming forty hours worked per week at his post-JPC job, Mondal's wage would be approximately $12.79 per hour.  The EEOC submits, for ease of calculation, that Mondal's pay rate at JPC should have been $12 per regular hour and $18 per overtime hour.  The Court finds this proposal helpful and fair.

53.    Finally, defendants assert that all non-FLSA claims of three Chellen plaintiffs, Joshy Mathappan Aleparambu (JPC # 138), Poulouse Maleril-Varkey (JPC #116), and Jose Varghese Mannalil (JPC # 113) should be dismissed because these plaintiffs did not submit affidavits or otherwise appear at trial.  Pursuant to the parties' Joint Case Management Plan, the Court ordered plaintiffs to submit, by December 17, 2004, affidavits on the part of all plaintiffs who wished to remain in the case.  Defendants requested the affidavits in exchange for their agreement to allow plaintiffs to proceed by representative testimony.

54.    The affidavits were not filed with the Court, and the Court has no evidence that they were otherwise produced or submitted to defendants.  However, no mention was made of dismissal as a sanction for failure to file, produce, or submit the affidavits, either in that order, in subsequent orders, or in the Phase II proceedings.  The Court finds that these three individuals should not be dismissed merely because their counsel may have failed to obtain their affidavits, as defendants did not draw this fact to the Court's attention before or during the Phase II proceedings and have not shown any prejudice from the lack of those three affidavits.

24

55.     As discussed below, compensatory damages for discrimination may include damages for mental anguish or emotional distress. While many of the Chellen plaintiffs testified as to their psychological and emotional state during their time at the JPC facility, the EEOC also presented compelling testimony through its expert witness Florence Burke.  Burke opined that the Chellen plaintiffs were essentially "trauma" victims, much like those in worker exploitation cases with which she is familiar.   She testified specifically regarding depression, extreme anxiety, and fear experienced by the Chellen plaintiffs. Ph. II Tr. at 382-84.  She maintained that language limitations and unfamiliarity with the civil law and individual rights had the effect of increasing their confusion, hampering understanding of their expectations, and creating stress because of their uncertainty about criminal law and immigration issues. Id. at 384, 394.  She also discussed the erosion or undermining of the Chellen plaintiffs' support system of family, culture, and religious faith, especially since they felt they could not communicate freely about their experience with their families in India. Id. at 389-93.

56.     Burke acknowledged that defendants treated the Chellen plaintiffs in a positive manner on occasions, but she explained that defendants' practice of coupling this positive treatment with negative treatment kept the Chellen plaintiffs "off-balance" with regard to their expectations and hope, thus increasing their stress. Id. at 397-98.  Burke testified as to  the Chellen plaintiffs' lack of privacy and ability to communicate as well as their personal discomfort, humiliation, increased isolation, and an atmosphere of distrust caused by their constant awareness of surveillance by JPC and the leadmen recruited from their own group. Id. at 398-400.  The leadmen, in particular, experienced additional feelings of isolation and guilt due to their role. Id. at 401-02; see id. at 204-08, 473-76, 485.

57.     The EEOC urges the Court to consider the emotional harm caused by the Chellen plaintiffs'

health concerns as a result of JPC's alleged food rationing and denial of access to medical attention.

The EEOC also urges the Court to consider the emotional harm experienced by the Chellen plaintiffs

who were made to perform the dirtiest and lowest-level jobs not being performed by the comparably

qualified non-Indian co-workers at JPC.  The Court finds that the "A" classification adequately

compensates the Chellen plaintiffs for the emotional distress they experienced as a result of

defendants' disparate treatment and hostile work environment.[5]

58.     Given the Court's findings of fact as to the parties' wage stipulations, the Court concludes

that all of the Chellen plaintiffs other than Mohammed "Hassan" Usman, who settled his wage claim

through the DOL, are entitled to compensatory damages in an amount equal to the difference

between the actual wages paid to the Indian employees, as set forth in Def. Ex. 101, and the average

hourly wage earned by similarly-situated non-Indian JPC employees according to the job positions

and "A" classifications as set forth in Pl. Ex. 62B, less offsets itemized in Jt. Ex. 2 for expenses

related to food, medical needs, and telephone services.  The Court concludes that the defendants are

not entitled to offsets for expenses related to housing, uniforms, tools, and travel.  While the

amounts for each individual will vary, the total amount awarded for compensatory damages on the

EEOC's claims for violations of Title VII and § 1981 is $607,006.85.  The amount is the difference

between $633,258.52, the amount shown in the "Total Pay Earned" column of the "Class A"

calculations set forth in Attachment A of the EEOC's Proposed Findings and Conclusions (Dkt. #

201), less $26,251.67, the amount shown in the "Total Offsets" column of the  calculations set forth

in Attachment B of the EEOC's Proposed Findings and Conclusions (id.).

---

[5]        See Conclusion of Law ¶ 42, infra.

26

### Punitive

59.    Defendants' actions in obtaining inappropriate visas and setting up a scheme to pay the Chellen plaintiffs through AL Samit demonstrates that they knew that they were acting in violation of federal law.  The hostile work environment they created for the Chellen plaintiffs, and the disparate treatment afforded them, was intentional and discriminatory.  Punitive damages may not deter these defendants from malicious and willful conduct based on the race or national origin of future employees, but it may serve to deter other employers from attempting the same.  The Court finds that an award of punitive damages against both JPC and John Pickle for their violations of the Chellen plaintiffs' civil rights is appropriate.[6]  Accordingly, the Court awards punitive damages in the amount of $1,000 per Chellen plaintiff, against both defendants, jointly and severally, for a total amount of $52,000 on this claim.

### State Law Tort Claims

#### Deceit

### Liability

60.    As set forth in the Court's prior findings, defendants hired the Chellen plaintiffs after a prior experience of bringing a group of 20 Indian men[7] to Tulsa in preparation for work in Kuwait for joint venture between JPC and a Kuwaiti company.  See Chellen I, 344 F. Supp. 2d at 1280 (FOF

---

[6]    Since JPC employed over 100 but fewer than 201 employees for each month from January 2001 through January 2002, Ph. II Tr. at 836-38; Pl. Ex. 82, the combined amount awarded for compensatory and punitive damages per plaintiff is limited under Title VII, see Conclusion of Law ¶ 43, infra.  Further, John Pickle cannot be held personally liable under Title VII, but he can be held personally liable under § 1981.  See id. ¶ 22, infra.

[7]    Joe Reeble, JPC Executive Vice-President and Chief Operating Officer, testified that one of the 20 may have been from Pakistan; the remainder were from India.  Ph. I. Tr. at 67.

¶¶ 1-2).  Defendants contend that they recruited the Chellen plaintiffs for the same purpose, but that purpose was not communicated to the Chellen plaintiffs when they were hired.  Id. at 1280 (FOF ¶ 3).  The original group of 20 workers stayed at JPC four months, and were sent to work in Kuwait at the end of that period.  Ph. I Tr. at 66-67, 73-79, 81-86; see Pl. Exs. 9-12; Def. Exs. 69-75, 77, 78. Joe Reeble testified that he, Ray Murzello, and John Pickle put together the plan to bring the Chellen plaintiffs to work at JPC in Tulsa as part of the same alleged training program.  Ph. I Tr. at 63.

61.     Also as set forth in the Court's prior findings, John Pickle personally met with the Chellen plaintiffs, individually, in India. Chellen I, 344 F. Supp. 2d at 1281 (FOF ¶ 7);  Ph. I Tr. at 406.  He knew that they looked to him as a father figure and believed that they would be working for him and not AL Samit.  Id. at 414.  While translators were present at both the individual and group meetings in India, many, if not all, of the plaintiffs could understand English and understood the promises being made by John Pickle individually.  Ph. I Tr. at 691-92; Ph. II Tr. at 434-35; 516.  Similar representations were made by AL Samit representatives, as agents of John Pickle and JPC. E.g., Ph. I Tr. at 442-43; Ph. II Tr. at 34-37.

62.     The Court's prior findings summarize the sacrifices the Chellen plaintiffs made in reliance on defendants' misrepresentations.  They traveled long distances and paid substantial service charges to agents of AL Samit to obtain JPC employment, and they left their jobs,  their businesses, and their families to come to the United States.  Chellen I, 344 F. Supp. 2d at 1281 (FOF ¶ 4.) Testimony at Phase II of the trial provided further detail for these findings.  See Ph. II Tr. at 38, 270, 329, 437-38, 494-95, 510, 577-78, 609.

63.     The Court has previously described the circumstances of the Chellen plaintiffs' departure from India, and the representations that were made to them by defendants and defendants' agents

with regard to the Undertakings and Offer Letters the Chellen plaintiffs were required to sign at that time.  Chellen I, 344 F. Supp. 2d at 1281-82 (FOF ¶¶ 8-10).  When the Chellen plaintiffs inquired as to inconsistencies between what they were promised and certain terms in those documents, defendants told them that the differences were a result of the September 11, 2001 attack on the World Trade Center and defendants assured them that signing of the documents was a mere formality. Id.; see Ph. I Tr. at 698.  The Undertaking, in particular, required the Chellen plaintiffs to "confirm" that they had "neither paid any service charges nor ticket money to M/s. Al Samit International for going to John Pickle Co., INC USA . . . ."  Def. Exs. 1F-53F.  Defendants claim that they told AL Samit not to collect any fees and that they never knew about the Chellen plaintiffs' payments to AL Samit.

64.     At the Phase II trial, a Chellen plaintiff testified that John Pickle personally deflected their concerns by telling them that "everything would be taken care of" and "fixed" upon their arrival in America.  Ph. II Tr. at 44-45.  One of the things that should have been "fixed" were the visas obtained by defendants for the Chellen plaintiffs.  As previously described, defendants obtained B1/B2 "business visitor" visas instead of H3 "trainee" visas or H2B "temporary non-immigrant worker" visas.  Chellen I, 344 F. Supp. 2d at 1282 (FOF ¶ 10), 1290 (FOF ¶¶ 51, 52, 57).

65.     During the individual and group meetings in India, defendants and/or their agents represented to the Chellen plaintiffs that they would receive good wages and overtime pay, free food, free living accommodations, free insurance, free medical services, an American driver's license for those plaintiffs who had Indian licenses, a cell phone, and a job for at least two years.  Ph. I. Tr. at 454, 689; Ph. II Tr. at 160-61, 435-36; see Chellen I, 344 F. Supp. 2d at 1280-81 (FOF ¶¶ 4, 7).  In Phase I of the trial, one Chellen plaintiff testified he was told he would be paid from $650 per month plus

29

overtime, with pay increases after six months, to $1,200 per month after 18 months.  Ph. I. Tr. at 442-43.  Other testimony indicated that they were promised $800 per month.  Id. at 689.  The Court finds that defendants made the misrepresentations as to pay, food, insurance, and duration of the job as positive assertions that they knew were false, or that they made recklessly without knowledge of the truth.  Defendants had prior experience with recruiting workers from India, and they used that experience to attempt to expand their labor force in a manner that violated U.S. law and took unfair advantage of the workers they recruited.

66.     In Phase II of the trial, several plaintiffs testified that they relied on representations made by AL Samit and/or John Pickle on behalf of JPC, and such reliance caused them to pay monies to AL Samit or its subagents before the Chellen plaintiffs executed the written "Undertakings" and "Offer Letters."  Ph. II Tr. at 38-40, 167-68, 251-52, 281, 437, 516-17, 558, 605, 620-21, 691, 767-68, 821-22.  Some testified that they were offered the same amount of money, or less, as they agreed to accept in the Undertakings and Offer Letters, or what they were actually paid by JPC.  Id. at 545, 603-05, 620-22, 640-41.  Others testified that they were to receive more in wages than set forth in the Undertakings and Offer Letters.  Id. at 41, 133-34, 168-69, 691, 766.  The Court finds that defendants acted with the intention that their false material misrepresentations be acted upon. They intended that the Chellen plaintiffs would act upon their misrepresentations by agreeing to work for defendants in Tulsa, and by traveling to Tulsa to perform that work.  The Chellen plaintiffs relied on the misrepresentation to their own detriment.  As set forth above, they traveled long distances and paid substantial service charges to agents of AL Samit to obtain JPC employment, and they left their jobs, their businesses, and their families to come to the United States.  They suffered detriment in the form of wages lower than expected, poor living conditions and food, and unwarranted

restrictions on their movement, communications, worship opportunities, privacy, and access to

health care.  They also endured a discrimination due to their national origin through disparate

treatment and a hostile work environment.  Plaintiffs have established fraud by clear, satisfactory,

and convincing evidence.

67.     The Proposal on Manpower Training Between AL Samit International and John Pickle

Company Inc., dated September 30, 2001 (Pl. Ex. 25), indicates that JPC would pay the Chellen

plaintiffs as follows:

- Welders - USD 550 per month (based on 40 hours per week + 1.5 times overtime)
- Fitters - USD 500 per month (based on 40 hours per week + 1.5 times overtime)
- Electrical Maintenance Technician - USD 500 per month (based on 40 hours per week + 1.5 times overtime)
- Roll Operators - USD 500 per month based on 40 hours per week + 1.5 times overtime)
- Cooks - USD 400 per month (based on 40 hours per week + 1.5 times overtime)

Pl. Ex. 25, at 3 ¶ 22.  JPC also agreed that the work hours for the Chellen plaintiffs would be an

average of 53 hours per week, which included 13 hours overtime.  Id. at 2 ¶ 6.  The Proposal also

indicates that JPC would provide to the Chellen plaintiffs health insurance, accommodations, three

meals a day, transportation from "residence to the works" and for shopping once a week, and leave

to include eight public holidays plus annual leave after a year, among other things. Id. at 1, 2, ¶¶ 2,

3, 4, 5, 7.

68.     The Offer Letters to each Chellen Plaintiff reflect the hours set forth in the Proposal. See

Def. Exs. 1E-51E.  The Offer Letters represent that the welders were to be paid for a minimum of

13 hours overtime, and a total minimum wage per month of $794.  All of the other Chellen plaintiffs

except the cook were to be paid a minimum of 13 hours overtime, and a total minimum wage per

month of $722. The cook was promised $100 of fixed overtime per month and $500 in regular wages per month. Def. Ex. 30E.

69. Contrary to the representations made to the Chellen plaintiffs in the Offer Letters, defendants paid them between $2.89 and $3.17 per hour, <u>Chellen I</u>, 344 F. Supp. 2d at 1282 (FOF ¶ 11), which would have meant a monthly paycheck for regular hours in an amount between $462.40 and $507.20. The Chellen plaintiffs were also charged a monthly fee of $50, which was deducted directly from their paychecks. As discussed above, the living conditions were far from what the Chellen plaintiffs were promised. The cooks, in particular, were not provided adequate facilities, cookware, and utensils necessary to cook for 30 men, much less 52. <u>See</u> Ph. II Tr. at 47-48, 53. The Chellen plaintiffs' access to medical care was sometimes restricted, and defendants never provided them with insurance, a driver's license, a cell phone, or a job beyond the few months they were employed at JPC.

**Damages**

70. After the Chellen plaintiffs left JPC on February 5, 2002, the Chellen plaintiffs were prohibited from gainful employment by immigration laws and the terms of the visas procured for them by the defendants. Until they began receiving authorization to work in November 2002, most of them relied on charitable organizations and American citizens for their survival. <u>See</u> Ph. II Tr. at 112, 340-41, 499-500. As stipulated by the parties, the Chellen plaintiffs were authorized to work after their departure from JPC on the dates indicated by Certification Letters issued by the Department of Health and Human Services, Office of Refugee Resettlement. Pl. Ex. 81. Although the plaintiffs were promised wages for two years after their arrival at the JPC facility in Tulsa, the Chellen plaintiffs have stipulated that they do not seek pay for wages lost as a result of the deceit

beyond the certification dates cited in the Certification Letters.  Ph. II Pretrial Order, Dkt. # 178, at

III (F).  For some of those plaintiffs, the date is November 18, 2002; for others, it is November 26,

2002. Pl. Ex. 81.

71.      The Chellen plaintiffs assert that, by November 30, 2002,[8] most of them would have been

authorized to work and would have had the opportunity to obtain work in the United States. Pl. Ph.

II Proposed Findings and Conclusions, Dkt. # 200, at 38.  This date is almost ten months after the

February 5, 2002 departure date from JPC for the Chellen plaintiffs remaining after the attempted

deportation of seven Chellen plaintiffs.  Since the pay promised to defendants was per month, the

Court finds this ten-month period appropriate for calculating deceit damages.  Deceit damages for

the period of time the Chellen plaintiffs worked at JPC prior to their departure on February 5, 2002

are subsumed in and would be duplicative of any damages awarded for violations of the FLSA, Title

VII, and § 1981 as those damages are more, per month, than what plaintiffs were offered.  While

some of the plaintiffs left earlier than February 5, 2002, the record is not clear as to the dates those

plaintiffs left.  Consequently, the Court will consider only this ten-month period an appropriate

measure for such damages.

72.      As the factual basis for deceit damages during this ten-month period, since the testimony at

trial was not clear as to exactly what each Chellen plaintiff was promised, the Court accepts the

amount set forth in the Offer Letter for each Chellen plaintiff.  Although that amount varies by job

duty, at approximately $750 per month, the total amount of deceit damages is $7,500 per Chellen

---

[8]      The date asserted by the Chellen plaintiffs in their proposed findings and conclusions is
November 30, 2003, see Dkt. # 200, at 38, but that appears to be a typographical error, given
other representations on page 12 of the same document, and the dates set forth in the
Certification Letters admitted as Pl. Ex. 81.

plaintiff.  Since there are 52 plaintiffs, the total amount is $390,000.  This amount does not include

the overtime the plaintiffs were promised, as it is not possible to calculate how much overtime, or

at what rate, each plaintiff would have expected when defendants, through their agent, AL Samit,

deceived or defrauded the Chellen plaintiffs.   In addition, defendants are entitled to the amounts

each paid to AL Samit to obtain their employment with JPC.  This amount is set forth in Def. Ex.

102 and, although the amount varies by individual, the total is  $82,056.  Although the Chellen

plaintiffs sought punitive damages in their Fifth Amended Complaint on this count, they did not

request punitive damages in their proposed findings of fact and conclusions of law on this claim.

In any event, the Court has awarded punitive damages, based on the same or similar facts, for

defendants' violations of the Chellen plaintiffs' civil rights.  Hence, any additional punitive damages

would be duplicative and constitute a double recovery.

**False Imprisonment**

73.     As set forth above, defendants restricted the Chellen plaintiffs' movement, communications,

privacy, worship, and access to health care.  The evidence demonstrates that defendants kept the

Chellen plaintiffs' travel documents.  At the Phase II trial, expert witness Kevin Bales testified that

confiscation of travel documents is a common non-physical method of restraint.  Ph. I Tr. at 782-83.

He opined that this and other methods of restraint utilized by defendants were "more efficient" than

physical or violent control because "a worker who can retain some hope . . . will simply work much

harder and . . . in a more cooperative way."  Id. at 784-85.

74.     The Court finds that defendants unlawfully restrained the Chellen plaintiff's ability to move

about as they wished.  Although initially defendants permitted the Chellen plaintiffs some ability

to leave the JPC plant for shopping, worship, visiting friends and relatives on their own, or other

34

activities, defendants discouraged the plaintiffs from leaving by telling them of unfounded dangers outside the gates.  Later, defendants required the Chellen plaintiffs to obtain permission before leaving the premises, locked the main gates, employed an armed security guard to watch them, hired four "leadmen" from among the Chellen plaintiffs to report on the activities of the others, threatened the Chellen plaintiffs with arrest and deportation, and attempted to deport several of them back to India.  Defendants assert no valid justification for these actions.

75.     Defendants assert that plaintiffs could, and did, leave the JPC premises by the pedestrian gate, but there is undisputed evidence that the pedestrian gate led into the private yard of JPC employee Sharon Sartin.  Given defendants' threats and the presence of the armed security guard, the Chellen plaintiffs would not have felt free to leave through that gate.  The evidence indicates that some plaintiffs crawled under a fence at another, less visible place on the property to leave the premises.  Defendants' actions constitute unlawful restraint, detention, or confinement.

76.     John Pickle personally participated in, or proximately caused, the false imprisonment of the Chellen plaintiffs.  While there is no direct evidence that he personally committed, ordered, or directed most of the acts that constitute the false imprisonment in this case, he did discourage the Chellen plaintiffs from leaving to attend worship services and he threatened, with respect to one of the plaintiffs who left, that he would "pull him up by his hair and bring him to justice."  Ph. II Tr. at 109.  He also indirectly participated in the actions of JPC managers that constitute false imprisonment by allowing such actions to occur or otherwise indicating his approval by failing to end the unlawful practices.

77.     Although the restrictions on movement of the Chellen plaintiffs is part of the disparate treatment claim under Title VII and § 1981, and thus subsumed in damages under those statutes for

their working hours, the restrictions were endured during non-working hours and weekends.
Accordingly, the Court awards damages for false imprisonment for these periods in the amount of
$1,000 per Chellen plaintiff, for a total amount of $52,000 on this claim.  As with their claim for
deceit or fraud, the Chellen plaintiffs sought punitive damages in their Fifth Amended Complaint
on their claim for false imprisonment, but they did not request punitive damages in their proposed
findings of fact and conclusions of law on this claim.  In any event, the Court has awarded punitive
damages, based on the same or similar facts, for defendants' violations of the Chellen plaintiffs' civil
rights.  Hence, any additional punitive damages would be duplicative and constitute a double
recovery.

### Intentional Infliction of Emotional Distress

78.     Many of the facts relevant to the Chellen plaintiffs' claims of intentional infliction of
emotional distress are also set forth above in relation to their civil rights claims.  In particular, the
job assignments, restrictions, and living conditions to which they were subjected, as well as the
hostile work environment, all contributed to the emotional distress they experienced.  In particular,
the seven individuals whom defendants attempted to deport suffered significant personal
embarrassment, humiliation, and fear.  See Ph. II. Tr. at 215, 308-09, 798-814, 817.

79.     Defendants cursed at, embarrassed, and harassed all of the plaintiffs to maintain physical and
psychological control over them.  The cultural significance of profanities implying that the Chellen
plaintiffs were illegitimate children made such language particularly offensive to them.  Id. at 200-
01, 664-65.  John Pickle admitted using abusive and profane language in reference to the Chellen
plaintiffs.  Ph. I. Tr. at 393.

80.     Defendants admit that JPC managers John Holcomb and Dale Chastain used profanity, but they argue that such use was appropriate in the context it was used.  That context involved a meeting to find out who among the plaintiffs had taken a JPC vehicle without permission, drove it without having a driver's license and after having consumed alcohol, and damaged the JPC vehicle before returning it.  See Ph. II Tr. at 198-201, 611-13.  Defendants also point out that John Pickle arranged a roller-skating party for the first group of Chellen plaintiffs to arrive, took them to see Christmas lights, and was otherwise friendly to them.  Id. at 298, 323, 342-43, 488, 584, 631, 644, 953-54, 958-59; e.g., Def. Exs. 8M, 15N, 28H, 31R, 33P, 41Q.

81.     The Chellen plaintiffs tell a different story, and many plaintiffs suffered physical problems as a consequence of defendants' conduct.  At least two explained that the rationing of food caused them physical problems which interfered with their ability to work.  Ph. II Tr. at 285, 561.  The food rationing also caused some of the plaintiffs to violate the dietary tenets of their religion and eat foods that they would never have considered eating but for the circumstances.  Id. at 561.

82.     Several plaintiffs testified to other effects of the emotional distress they felt.  Chellen plaintiff Bharathakumaran Nair testified that, as a result of John Holcomb's actions toward him, he contemplated suicide.  Ph. I. Tr. at 708-09.  Jeron Peters similarly recalled that, as a result of Holcomb's treatment of him, "I was upset . . . .  I just prayed to God that something would change."  Id. at 334.  The cook, Toofan Mondal, testified to the indignation he suffered when he felt compelled to fall at John Pickle's feet to beg for relief.  Ph. II Tr. at 81.  He felt that working conditions at JPC were causing him to temporarily lose his sense and his mind.  Id.  He stated:

> I felt that if I went back to India and I had died in the midst of my family, my children, and mother around me . . . that would be a better outcome than living like a dead man here with all the pressure and not be able to sleep at night, not be able to rest.  I didn't know what I was doing.

Id. at 82.  Similarly, Roy Panackalpurackal testified that he felt "totally destroyed and . . . mentally

and in every way after coming here and experiencing this torture."  Id. at 603.   He stated "I was

emotionally and in every way so drained I couldn't even tell my wife about the situation," and that

he felt he had "pretty much . . . destroyed all my life."  Id.  Defendants' actions towards the Chellen

plaintiffs progressively worsened over the period they worked at JPC.  As set forth supra, several

JPC managers and John Pickle created a living and working environment for the Chellen plaintiffs

that was highly stressful and oppressive.  Complaints by the Chellen plaintiffs were met with

hostility and greater restrictions.  If the defendants did not know that their actions would cause

emotional distress, they acted recklessly in inflicting emotional distress upon the Chellen plaintiffs.

The job assignments, restrictions, living conditions, name-calling, profanity, and threats to which

the Chellen plaintiffs were subjected might not be considered outrageous alone, but in combination

and considering the totality of the circumstances, they constituted extreme and outrageous conduct.

John Pickle contributed personally to the emotional distress the Chellen plaintiffs experienced by

his management style, his derogatory and insulting words, and his persistent threats.  Defendants'

conduct went far beyond "inconsiderate and unkind" acts, "abusive outburst[s], or offensive verbal

encounter[s]," id., given the manner in which they employed, housed, paid, fed, and guarded the

Chellen plaintiffs.  The Chellen plaintiffs are entitled to recover on their claim for intentional

infliction of emotional distress.

83.     However, the Chellen plaintiffs' claim for intentional infliction of emotional distress is based

on much of the same evidence supporting their civil rights claims.  Accordingly, any damages

awarded for intentional infliction of emotional distress experienced during working hours are

subsumed in and would be duplicative of any compensatory or punitive damages awarded for

defendants' disparate treatment of the Chellen plaintiffs and creation of a hostile work environment. Any damages for intentional infliction of emotional distress during non-working hours are subsumed in and would be duplicative of any awarded for defendants' false imprisonment of the Chellen plaintiffs.

## CONCLUSIONS OF LAW

Any finding of fact which is more appropriately characterized as a conclusion of law is incorporated herein.

### FLSA

#### Liability

1.      In its prior findings and conclusions, the Court found that the Chellen plaintiffs were employees, and not trainees, under the FLSA.   Chellen I, 344 F. Supp. 2d at 1294.   Persons determined to be "employees" under the FLSA were entitled to minimum wage of $5.15 per hour during the time period that the Chellen plaintiffs worked for JPC. 29 U.S.C. §206(a).  For overtime hours, they were entitled to one and one-half times the rate for regular hours.  Id. § 207(a).  It is undisputed that JPC did not pay the Chellen plaintiffs at the statutory rates.

2.      The Court previously concluded that the definition of "employee" under the FLSA imposes no limitation based on nationality or immigration status. See Patel v. Quality Inn South, 846 F.2d 700, 706 (11th Cir. 1988) (undocumented East Indian workers considered employees for purposes of coverage under the FLSA); cf. Donovan v. Burgett Greenhouses, Inc., 759 F.2d 1483, 1486 (10th Cir. 1985) (employer required to pay wages, including overtime for work performed by illegal

aliens)[9]; see also In re Reyes, 814 F.2d 168, 170 (5th Cir. 1987).  The Court also recognized that

other federal labor laws, the National Labor Relations Act in particular, have been held applicable

to unfair labor practices committed against undocumented aliens.  Chellen I, 344 F. Supp. 2d at 1294

(citing Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 892 (1984)).

3.      Defendants argued that the Chellen plaintiffs, as holders of B1 or B2 visas, were not

authorized or eligible to be employed for wages in the United States, and they cited Hoffman Plastic

Compounds, Inc. v. NLRB, 535 U.S. 132, 140 (2002), in support.  The Court essentially determined

that, given the holding of Hoffman, the argument was not relevant to its determination for Phase I

purposes, but could be relevant to the issue of damages.  See Chellen I, 344 F. Supp. 2d at 1293-94

(COL ¶ 11).  The Court left that determination for a later stage of the proceedings, and it permitted

the parties to brief the issue prior to the Phase II trial proceedings.  Id.

          **Damages**

4.      After reviewing the parties' briefs on the issue, the Court concludes that Hoffman does not

preclude an award for work actually performed by the Chellen plaintiffs.  It may preclude an award

of back pay, but plaintiffs do not seek back pay.  Thus, the award for work performed should equal

the difference between what JPC actually paid them and what they would have earned if they had

been paid minimum wage for the hours they worked, including overtime, less any offsets (for

compensation other than salaries paid) to which JPC may be entitled.

5.      In Hoffman, the United States Supreme Court held that federal immigration policy foreclosed

the National Labor Relations Board ("NLRB") from making a back pay award to an undocumented

---

[9]      The relevant rationale is found in the text of the district court decision being reviewed by the
appellate court, Donovan v. Burgett Greenhouses, Inc., No. 76-173, 1983 WL 2139 (D. N.M.
Nov. 23, 1983).

alien[10] who had never been legally authorized to work in the United States.  535 U.S. at 140.

Backpay was an issue because the worker had been fired for union-related activities.  The Hoffman

court emphasized that the employee was guilty of serious illegal conduct in connection with his

employment as he had provided fraudulent work documentation to the employer when he applied

for the job.  Id. at 141.  Significant for purposes of this decision, the Hoffman court noted that the

NLRB sought "to award backpay to an illegal alien for years of work not performed, for wages that

could not lawfully have been earned, and for a job obtained in the first instance by a criminal fraud."

Id. at 148-49.

6.      The Chellen plaintiffs did not seek to enter the United States illegally or to work illegally

here.  Instead, they were misled by their employer to believe that their employment was legal.

Defendants hired them knowing that they could not be legally employed in the United States, given

the types of visa obtained for the Chellen plaintiffs by the defendants.  At least one case decided

since Hoffman has explicitly determined that Hoffman does not preclude FLSA protection for

undocumented workers, as an award against a "knowing employer" would be consistent with

immigration policies referenced by Hoffman.  Singh v. Jutla & C.D. & R.'s Oil, Inc., 214 F. Supp.

2d 1056, 1061 (N.D. Cal. 2002).

7.      Further, Hoffman does not purport to preclude a backpay award for work that was actually

performed by undocumented workers.  The backpay at issue in Hoffman involved an amount

calculated for a period of time after the date of the undocumented worker's termination of

---

[10]     Significantly, the Chellen plaintiffs were not "undocumented."  They had visas, albeit ones
that did not permit them to work in the United States.  They were not in the United States
illegally, although they were working here illegally due to the failure of defendants to obtain
proper visas.

employment. 535 U.S. at 141-42. It did not involve wages for work already performed. The EEOC is not seeking backpay for the time subsequent to the Chellen plaintiffs' work at JPC.

8.      Courts in several jurisdictions have found that <u>Hoffman</u> does not limit backpay for work already performed. <u>Galaviz-Zamora v. Brady Farms, Inc.</u>, 230 F.R.D. 499, 501-02 (W.D. Mich. 2005) (<u>Hoffman</u> did not compel discovery regarding immigration status of workers in FLSA case to recover backpay for work already performed); <u>Martinez v. Mecca Forms, Inc.</u>, 213 F.R.D. 601, 604-05 (S.D. Fla. 2002) (<u>Hoffman</u> limitation inapplicable where plaintiffs did not seek post-termination backpay under Migrant and Seasonal Agricultural Worker Protection Act); <u>Liu v. Donna Karan Int'l, Inc.</u>, 207 F. Supp. 2d 191, 192 (S.D.N.Y. 2002) (<u>Hoffman</u> did not justify discovery related to plaintiff's immigration status in an FLSA claim involving work actually performed); <u>Flores v. Amigon</u>, 233 F. Supp. 2d 462, 464 (E.D.N.Y. 2002) (protective order was appropriate regarding immigration status, despite <u>Hoffman</u>, where plaintiff sought unpaid overtime for work performed rather than backpay for future unperformed work); <u>Flores v. Albertsons, Inc.</u>, 2002 WL 1163623 at *5 (C.D. Cal. Apr. 9, 2002) ("<u>Hoffman</u> does not establish that an award of unpaid wages to undocumented workers for work actually performed runs counter to IRCA.").

9.      Significantly, a case decided since the parties submitted their briefs on this issue addresses the issue in depth and holds that workers are not precluded by virtue of their undocumented status from seeking relief under the FLSA for unpaid minimum wage and overtime claims. <u>Zavala v. Wal-Mart Stores, Inc.</u>, 393 F. Supp. 2d 295 (D.N.J. 2005). The <u>Zavala</u> court discusses <u>Hoffman</u> extensively and supports the plaintiffs' arguments that: (1) unlike the plaintiffs in <u>Hoffman</u>, the <u>Zavala</u> plaintiffs were seeking unpaid wages for work already performed; (2) the statutory text of the FLSA does not limit relief to citizens; (3) the DOL interprets the FLSA to cover undocumented

42

workers even after <u>Hoffman</u>; and (4) post-<u>Hoffman</u> decisions have construed the FLSA to cover

undocumented workers. <u>Id.</u> at 321-25.  The Court is persuaded by the thorough analysis set forth in

<u>Zavala</u>.

## Offsets

10.    Section 203(m) of the FLSA provides, in relevant part:

> "Wage" paid to any employee includes the reasonable cost. as determined by the
> Administrator, to the employer of furnishing such employee with board, lodging, or
> other facilities, if such board, lodging, or other facilities are customarily furnished
> by such employer to his employees:  Provided, . . . That the Secretary is authorized
> to determine the fair value of such board, lodging, or other facilities for defined
> classes of employees and in defined areas, based on average costs to the employer
> or to groups of employers similarly situated, or average value to groups of
> employees, or other appropriate measures of fair value.  Such evaluations, where
> applicable and pertinent, shall be used in lieu of actual measure of cost in
> determining the wage paid to any employee.

29 U.S.C. § 203(m).  The applicable regulations defining "reasonable cost" provide that the "cost

of furnishing 'facilities' found by the Administrator to be primarily for the benefit or convenience

of the employer will not be recognized as reasonable and may not therefore be included in

computing wages." 29 C.F.R. §531.3(d).  Such items include tools, the cost of any constructions by

and for the employer; and the costs of uniforms where the nature of the business requires the

employee to wear a uniform.   29 C.F.R. § 531.3(d)(1).   In determining whether a facility is

"primarily" for the benefit of the employer or the employee, courts have focused on whether a

particular facility has substantial value to and could be freely used by the employee independent of

the job performed.  <u>See</u>, <u>e.g.</u>, <u>Soler v. G & U Inc.</u>, 833 F.2d 1104, 1108-09 (2d Cir. 1987).

11.    While some courts have held a presumption to exist that lodging is a reasonable cost

deductible from wages where an employer requires an employee to live on site to meet a particular

need of the employer or when an employee is required to be on call at the employer's behest, the

presumption may be rebutted.  Soler, 833 F.2d at 1109-10; Marshall v. Truman Arnold Dist. Co., Inc., 640 F.2d 906, 909 (8th Cir. 1981); Marshall v. Bernard Debord, No. 77-106-C, 1978 WL 1705 at *6 (E.D. Okla. July 27, 1978) (unpublished); Masters v. Maryland Management Co., 493 F.2d 1329, 1334 (4th Cir. 1974); Bailey v. Pilots' Assoc., 406 F. Supp. 1302, 1309 (E.D. Pa. 1976); see 1996 WL 1005231 U.S. Dept. of Labor, Op. Ltr. of the Wage and Hour Div. (Nov. 5, 1996).  Courts have not permitted credit for lodging when the housing furnished by the employer is "seriously substandard" or not "customarily furnished" to other employees. See Archie v. Grand Central Partnership, Inc., 86 F. Supp. 2d 262, 269-70 (S.D.N.Y. 2000); Castillo v. Case Farms of Ohio, Inc., 96 F. Supp. 2d 578, 638 (W.D. Tex. 1999); Osias v. Marc, 700 F. Supp. 842, 845 (D. Md. 1988). Similarly, courts have refused to permit offsets for housing provided to employees when the employer fails to keep or produce records or other credible evidence as to the reasonable cost of such housing.  See Donovan v. Williams Chem. Co., Inc., 682 F.2d 185, 189 (8th Cir. 1982); Brock v. Carrion, Ltd., 332 F. Supp. 2d 1320, 1326-27 (E.D. Cal. 2004).

12.     The Court concludes that the defendants are not entitled to offsets for expenses related to housing, uniforms, tools, and travel. They are entitled to offsets for food, medical expenses and telephone expenses.

**Liquidated Damages**

13.     The FLSA provides, in relevant part: "Any employer who violates the provisions of Section 206 or Section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional amount as liquidated damages." 29 U.S.C. § 216(b).  The Tenth Circuit has remarked that "[t]he purpose for the award of liquidated damages is the reality that the retention of a

44

workman's pay may well result in damages too obscure and difficult of proof for estimate other than

by liquidated damages." Jordan v. U.S. Postal Serv., 379 F.3d 1196, 1202 (10th Cir. 2004) (citations

and internal quotations omitted).  The Jordan court agreed with the Second Circuit that "[l]iquidated

damages are not a penalty exacted by the law, but rather compensation to the employee occasioned

by the delay in receiving wages due caused by the employer's violation of the FLSA." Id. (quoting

Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir. 1999)).

14.     Specifically with regard to liquidated damages, the statute further provides:

> In any action commenced prior to or on or after May 14, 1947 to recover unpaid
> minimum wages, unpaid overtime compensation, or liquidated damages, under the
> Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], if the
> employer shows to the satisfaction of the court that the act or omission giving rise
> to such action was in good faith and that he had reasonable grounds for believing that
> his act or omission was not a violation of the Fair Labor Standards Act of 1938, as
> amended, the court may, in its sound discretion, award no liquidated damages or
> award any amount thereof not to exceed the amount specified in section 216 of this
> title.

29 U.S.C. § 260; see Pabst v. Oklahoma Gas & Elec. Co., 228 F.3d 1128, 1136 (10th Cir. 2000).

Without the required showing, the trial court is required to award liquidated damages. Greene v.

Safeway Stores, Inc., 210 F.3d 1237, 1245 (10th Cir. 2000) (citation omitted); Renfro v. City of

Emporia, Kan., 948 F.2d 1529, 1540 (10th Cir. 1991) (citations omitted). "The good faith

requirement mandates the employer have 'an honest intention to ascertain and follow the dictates

of the Act.'. . . 'The additional requirement that the employer have reasonable grounds for believing

that his conduct complies with the Act imposes an objective standard by which to judge the

employer's behavior.'" Renfro, 948 F.2d at 1540 (quoting Marshall v. Brunner, 668 F.2d 748, 753

(3rd Cir. 1982)).

45

15.     Defendants have not shown that they acted in good faith and that they had reasonable grounds for believing their acts were not a violation of the FLSA.[11]  They have asserted that they thought they were creating and executing a training program, but several factors in the record belie this assertion:  the manner in which they recruited the Chellen plaintiffs; the representations made to induce the Chellen plaintiffs to work for JPC; the visas obtained for the Chellen plaintiffs; the type of work they expected from plaintiffs; the backdated evaluations for the Chellen plaintiffs; and the manner in which they routed wages to the Chellen plaintiffs, among others.  They have not attempted even to show "reliance on attorneys or other experts in personnel matters-that courts have found particularly persuasive in holding FLSA violations reasonable."  See Pabst, 228 F.3d at 1136; Doty v. Elias, 733 F.2d 720, 726 (10th Cir. 1984) (citation omitted).  As award of liquidated damages to the Chellen plaintiffs is warranted.

16.     The Jordan court concluded that "liquidated damages are statutorily calculated, under . . . the FLSA . . . based on the full amount of wages that were denied or lost because of a statutory violation."  Id.  The Jordan court cited with approval an Eighth Circuit decision holding that the FLSA requires an award of liquidated damages equal to the full amount of back pay.  Id. (citing Braswell v. City of El Dorado, Ark., 187 F.3d 954, 956 (8th Cir. 1999)).  That amount is further reduced, however by the offset awarded for food, medical needs, and telephone services.  See generally Cooper v. Asplundh Tree Expert Co., 836 F.2 1544, 1555 (10th Cir. 1988) ("offsets of interim earnings, severance pay, pension benefits, and the like must be taken against back pay *before* the award is doubled as liquidated damages," although an offset for an arbitral award would not be

---

[11]     The Court need not determine whether defendants acted willfully as there is no issue as to whether the plaintiffs brought their claim within the applicable statute of limitations.  See 29 U.S.C. § 255(a); Brinkman v. Dep't of Corrections, 21 F.3d 370, 372 (10th Cir. 1994).

applied).  The Court's award of liquidated damages precludes an award of prejudgment interest, "because it is settled that such interest may not be awarded in addition to liquidated damages." <u>Dep't of Labor v. City of Sapulpa, Okla.</u>, 30 F.3d 1285, 1290 (10th Cir. 1994) (citations omitted).

### John Pickle

17.    The Court finds that there is sufficient evidence to hold John Pickle personally liable for JPC's violation of the FLSA.  The statute provides, in relevant part,:  "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).

18.    In determining whether a person is an "employer" under this provision, many courts use an "economic reality test" which "encompasses the totality of the circumstances, no one of which is exclusive."  <u>Herman v. RSR Sec. Servs. Ltd.</u>, 172 F.3d 132, 139 (2d Cir. 1999); <u>see</u> <u>United States Dep't of Labor v. Cole Enters. Inc.</u>, 62 F.3d 775, 778 (6th Cir. 1995); <u>Donovan v. Grim Hotel Co.</u>, 747 F.2d 966, 972 (5th Cir. 1984); <u>Donovan v. Agnew</u>, 712 F.2d 1509, 1510 (1st Cir. 1983).  Courts look to "whether the alleged employer possessed the power to control the workers in question," <u>Herman</u>, 172 F.3d at 139. They also consider the person's position in the company, ownership interest, and has "control over significant functions of the business." <u>Cole Enters. Inc.</u>, 62 F.3d at 778; <u>see</u> <u>Grim Hotel Co.</u>, 747 F.2d at 971-72; <u>Agnew</u>, 712 F.2d at 1511.

19.    John Pickle meets all of these tests.  As president of JPC, John Pickle acted directly in the interest of JPC - the company that bears his name.  He personally acted to recruit the Chellen plaintiffs, and was personally involved in many, if not all, of the decisions which resulted in payment of less than minimum wage for the work performed by the Chellen plaintiffs.  He played

the leading role in causing JPC to under-compensate the Chellen plaintiffs.  The Court concludes

that he is individually liable to the Chellen plaintiffs under the FLSA.

### Civil Rights (Title VII and § 1981)

#### Liability

20.     The statutory provisions relevant to the plaintiffs' claims of discrimination in employment

begin with the following:  "All persons within the jurisdiction of the United States shall have the

same right in every State and Territory  . . . to the full and equal benefit of all laws and proceedings

for the security of persons and property as is enjoyed by white citizens . . . ."  42 U.S.C. § 1981(a).

The subsequently-enacted, more detailed remedial scheme of Title VII provides, in relevant part:

"It shall be an unlawful employment practice for an employer . . . to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because

of such individual's race, color, religion, sex or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1).

### Combined Title VII and § 1981 Claims

21.     Both § 1981 and Title VII afford a federal remedy against discrimination in private

employment on the basis of race, and both these causes of action may be prosecuted by the same

plaintiff based upon the same facts. E.g., Lowery v. Circuit City Stores, Inc., 206 F.3d 431, 440-41

(4th Cir. 2000) (citing Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 458 (1975)).  "In a case

under Title VII and § 1981 arising out of the same facts, the commonality of factual issues between

the § 1981 and Title VII claims is nearly all-encompassing. The elements of each cause of action

have been construed as identical." Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1444 (10th Cir.

1988); see Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir. 2006) (citation omitted);

Baca v. Sklar, 398 F.3d 1210, 1218 n.3 (10th Cir. 2005).  Accordingly, the standards to be applied

in evaluating a claim of racial discrimination in employment are the same in §1981 actions as those applied in actions brought pursuant to Title VII.  E.g., Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998); Wilson v. Legal Assistance of North Dakota, 669 F.2d 562, 563-64 (8th Cir. 1982). In particular, "[t]he allocations of burdens under Title VII applies to proving intentional discrimination under § 1981 as well."  Durham v. Xerox Corp., 18 F.3d 836, 839 (10th Cir. 1994); see McCowan v. All Star Maintenance, Inc., 273 F.3d 917, 921-22 (10th Cir. 2001); English v. Colorado Dep't of Corrections, 248 F.3d 1002, 1007 (10th Cir. 2001); Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000).

22.     However, John Pickle cannot be held liable in an individual or personal capacity under both statutes.  He can be held personally liable under § 1981, see Allen v. Denver Public School Bd., 928 F.2d 978, 983 (10th Cir. 1991), disapproved on other grounds, Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1228 (10th Cir. 2000), but not under Title VII, see Maldonado v. City of Altus, 433 F.3d 1294, 1316 (10th Cir. 2006) (citing Haynes v. Williams, 88 F.3d 898, 901 (10th Cir.1996); see Grimes, 929 F. Supp. at 1095.

23.     Further, "the remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct and independent."  Johnson v Railway Exp. Agency, Inc., 421 U.S. 454, 461 (1975).  Prior to 1991, Title VII plaintiffs were limited to "backpay commencing not more than two years prior to the filing of a claim with the EEOC, reinstatement, and other affirmative relief as may be appropriate."  Skinner, 859 F.2d at 1443 (citing Johnson, 421 U.S. at 458); see 42 U.S.C. § 2000e-5(g).  Individuals who proved a violation of § 1981, by contrast, could recover both compensatory and punitive damages, as well as back pay and lost benefits for an unlimited period of time.  Id. (citing Johnson, 421 U.S. at 460).  With the

49

passage of the Civil Rights Act of 1991, plaintiffs in Title VII cases are also entitled to compensatory and punitive damages, but those damages are subject to a cap that is not applicable in § 1981 cases. 42 U.S.C. § 1981a; see O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1257 (10th Cir. 2001).

24.     Section 1981a thus expands the remedies available to Title VII plaintiffs. E.g., West v. Boeing Co., 851 F. Supp. 395, 401 (D. Kan. 1994).  It does not permit double recovery under § 1981;  at the same time, it does not limit the scope of, or relief available, under § 1981.  See id. at 398 n.4; Johnson v. Metropolitan Sewer Dist., 926 F. Supp. 874, 876 (E.D. Mo. 1996); Bradshaw v. University of Maine System, 870 F. Supp. 406, 407 (D. Me. 1994).   "Where a plaintiff has alleged violation of both Title VII and Section 1981, the court will consider the alternative remedy under Section 1981 if violation of that statute can be made out on grounds different from those available under Title VII."  Grimes v. Superior Home Health Care of Middle Tennessee, Inc., 929 F. Supp. 1088, 1095 (M.D. Tenn. 1996).

### Race and National Origin

25.     Obviously, plaintiffs would prefer to recover under § 1981 to avoid the statutory damages cap applicable to Title VII claims.  Defendants assert that 42 U.S.C. §1981 was enacted for the purpose of eliminating intentional discrimination on the basis of race, and that §1981 does not encompass claims of discrimination based on  national origin.  Further, they contend that there was no evidence produced, whatsoever, that the Chellen Plaintiffs are of a race different than the Caucasian race, and that Caucasian is the race of JPC's management and most of its employees.  At least two courts have recognized that some anthropologists have classified some Indians as Caucasian.  See United States v. Bhagat Singh Thind, 261 U.S. 204, 210 (1923); Chankoke v.

Anheuser-Busch, Inc., 843 F. Supp. 16, 18 n.2 (D.N.J. 1994).  The United States Supreme Court has

rejected "the assumption that all those who might be deemed Caucasian today were thought to be

of the same race when § 1981 became law in the 19th  century."  Saint Francis College v. Al-

Khazraji, 481 U.S. 604, 610-11 (1987) (discussing the concept of race as it has evolved since the

passage of § 1981.)

26.     Accordingly, courts have struggled with the distinctions between race and national origin

in the context of § 1981 claims.  Some merely recite that §1981 does not prohibit discrimination

based solely on national origin.  E.g., Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F.

Supp. 2d 208, 224 (S.D.N.Y. 2003); Chaiffetz v. Robertson Research Holding, Ltd., 798 F.2d 731,

735 (5th Cir. 1986).  However, it is appropriate to analyze § 1981 claims in terms of ancestry and

ethnic characteristics where discrimination is not based solely on national origin.  Saint Francis

College, 481 U.S. at 613; Daemi v. Church's Fried Chicken, Inc., 931 F.2d 1379, 1387 n. 7 (10th

Cir. 1991); Manzanares v. Safeway Stores, Inc., 593 F.2d 968, 971 (10th Cir. 1979).

27.     As set forth in the Court's order addressing defendants' motions to dismiss (Dkt. # 85), the

Tenth Circuit has stated that "often the line between discrimination based on race and discrimination

based on national origin is "not a bright one."  Daemi, 931 F.2d at 1387 n. 7 (10th Cir. 1991)

(quoting Saint Francis College, 481 U.S. at 614 (1987) (Brennan, J., concurring)).  The Tenth Circuit

further observed:

> The concept of race under § 1981 is broad.  It extends to matters of ancestry which
> are normally associated with nationality, not race in a biological sense.  See Alizadeh
> v. Safeway Stores, Inc., 802 F.2d 111, 114-15 (5th Cir. 1986) (noting that persons
> of Iranian descent are a protected race under § 1981, although anthropologists
> classify them as Caucasian); Manzanares v. Safeway Stores, Inc., 593 F.2d 968, 971
> (10th Cir. 1979) (noting that § 1981 is "no[t] necessarily limited to the technical or
> restrictive meaning of 'race'"). . . . As the Supreme Court has noted, Congress
> intended § 1981 to "protect from discrimination identifiable classes of persons who

51

are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Saint Francis College, 481 U.S. at 613, 107 S. Ct. at 2028.

Daemi, 931 F.2d at 1387 n.7.

28.     The Daemi court ruled that, "[a]s a person of Iranian descent, Daemi was protected by §1981's bar against discrimination on the ground of race." Id.  Plaintiffs point out that several courts have allowed individuals of Indian/East Indian descent to proceed with § 1981 racial discrimination claims.  Chankoke v. Anheuser-Busch, Inc., 843 F. Supp. 16, 18 n.2 (D.N.J. 1994) ("Although Indians are technically classified as 'Caucasian,' they may still state a claim under Section 1981"); Jatoi v. Hurst-Euless-Bedford Hospital Auth., 807 F.2d 1214, 1218 (5th Cir.) (allegation that plaintiff was East Indian sufficient to invoke protection of § 1981), modified on other grounds, 819 F.2d 545 (5th Cir. 1987); Banker v. Time Chemical, Inc., 579 F. Supp. 1183, 1187 (N.D. Ill. 1983) (collecting cases); Baruah v. Young, 536 F. Supp. 356, 363 (D. Md 1982).  The Court finds that the Chellen plaintiffs' ancestry and ethnic characteristics likewise entitle them to claim the protections of §1981.

### Disparate Treatment

29.     To prevail under a disparate treatment theory, "a plaintiff must show, through either direct or indirect evidence, that the discrimination complained of was intentional." Maldonado v. City of Altus, 433 F.3d 1294, 1307 (10th Cir. 2006) (quoting EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1191 (10th Cir. 2000)).  The discrimination, of course, must be for a reason prohibited by the applicable statutes.  Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1306 (10th Cir. 2005) (citations omitted).  Disparate treatment claims may be established by either direct or circumstantial evidence.  E.g., Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1225 (10th

Cir. 2000); EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1192 (10th Cir. 2000); Perry v. Woodward, 199 F.3d 1126, 1134 (10th Cir. 1999).

30.     Plaintiffs' disparate treatment claims in this case have been established by direct evidence. Defendants recruited Indian workers in India, brought them to the United States, housed and fed them separately from the non-Indian JPC employees, identified them as Indians and made numerous discriminatory comments about their ancestry, ethnic background, culture, and country which leads to the conclusion that they treated the Chellen plaintiffs differently, and less favorably, due to their race and national origin.  In particular, defendants subjected the Chellen plaintiffs to greater testing requirements, lower job classifications, and less desirable job assignments.  They also restricted the Chellen plaintiffs' movement, communications, worship opportunities, and access to health care, and they required the Chellen plaintiffs to live in substandard housing and to subsist on food that was poor in quality and quantity.  The Chellen plaintiffs were paid lower wages and subjected to disparate terms, conditions, and privileges of employment as compared to similarly situated non-Indian workers.

31.     The Chellen plaintiffs were subject to disparate treatment and discrimination at the hands of JPC, its officers, managers, and agents.  The Court concludes that the circumstances of their recruitment, their work, and their living conditions show defendants' intent to discriminate on a racial basis.

**Hostile Work Environment**

32.     The Supreme Court has "broadly read Title VII 'to strike at the entire spectrum of disparate treatment of men and women in employment which includes requiring people to work in a discriminatorily hostile or abusive work environment.'"  McCowan, 273 F.3d at 922 (quoting Harris

v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Id. (quoting Harris, 510 U.S. at 21)). The Court is to "judge that atmosphere both objectively and subjectively" . . . [and] look at all the circumstances 'from the perspective of a reasonable person in the plaintiff's position.'" McCowan, 273 F.3d at 923 (citations omitted). The Tenth Circuit has also emphasized that, where the plaintiff alleges discrimination under § 1981 on the basis of ancestry, the harassment must be based on the victim's ancestry – general harassment is not actionable. Aramburu v. Boeing Co., 112 F.3d 1398, 1410 (10th Cir. 1997) (citing Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994)).

33. The JPC workplace was characterized by the severe and pervasive intimidation, ridicule and insult for the Chellen plaintiffs. Defendants set the stage for such an environment with the way in which they recruited the plaintiffs, classified them, set up the means of paying them wages, housed them, and fed them. The conditions of their employment were not favorable even in the beginning, and they progressively worsened as several of the plaintiffs left to escape conditions at the plant. Toward the end of their time at the plant, defendants' threats, intimidation, and abusive language became intolerable. Given the evidence as to the language used and the manner in which it was directed at the Chellen plaintiffs, and not others employed by JPC, there is no doubt that defendants based their harassment on the Chellen plaintiffs' national origin, ancestry and ethnicity.

34. There is no "mathematically precise test" to determine whether an environment is hostile or abusive, but some factors that may be considered include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance." <u>Harris</u>,

510 U.S. at 23.  Actual psychological harm, while relevant, is not required.  <u>Id.</u>  Defendants'

conduct was frequent, severe, physically threatening, and humiliating.  As discussed above in

connection with the Chellen plaintiffs' claim for intentional infliction of emotional distress, it also

caused psychological harm.

35.     In particular, the Tenth Circuit has long recognized that "a working environment dominated

by racial slurs constitutes a violation of Title VII."  <u>Hicks v. Gates Rubber Co.</u>, 833 F.2d 1406, 1412

(10th Cir. 1987). (citations omitted). Defendants' obscene and derogatory references with the word

"Indians" in reference to the Chellen plaintiffs constitute far more than the "few isolated incidents

of racial enmity" or " [c]asual comments, or accidental or sporadic conversation, [that] will not

trigger equitable relief pursuant to the statute." <u>Id.</u> (citations omitted).  Instead, they reflect a "steady

barrage of opprobrious racial comment" indicative of a hostile work environment so "heavily

polluted with discrimination as to destroy the emotional and psychological stability of the minority

[employee]."  <u>Id.</u> at 1212-13 (citations omitted).

36.     Defendants' offensive language was only part of the daily harassment experienced by the

Chellen plaintiffs at the JPC plant.  "We have repeatedly stated that in a case alleging a violation of

Title VII and the presence of a racially hostile work environment, the existence of [racial]

harassment must be determined in light of the record as a whole, and the trier of fact must examine

the totality of the circumstances, including the context in which the alleged incidents occurred.

<u>McCowan</u>, 273 F.3d at 925 (citations and internal quotations omitted).  The Court concludes that

the job assignments, restrictions on their freedom, privacy, communications, and worship, along

with the living conditions created an oppressive, hostile, and abusive working environment for the Chellen plaintiffs.[12]

## Personal Liability of John Pickle

37.    To impose personal liability under 42 U.S.C. § 1981, an individual defendant must be personally involved and have an affirmative link to the acts of intentional discrimination to causally connect the defendant with the claimed discriminatory practice. Allen v. Denver Public School Bd., 928 F.2d 978, 983 (10th Cir. 1991), disapproved on other grounds, Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1228 (10th Cir. 2000). "[P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Figures v. Board of Public Utilities of Kansas City, Kan., 731 F. Supp. 1479, 1483 (D. Kan. 1990). In this case, there is substantial evidence of John Pickle's individual conduct of discrimination, as shown by, among other things, his remarks to the Chellen plaintiffs as well as to JPC employees. He was personally involved in the discriminatory decisions and acts that led to the harm suffered by the Chellen plaintiffs. The Court concludes that John Pickle is personally liable for violating § 1981 in his actions towards the Chellen plaintiffs.

## Damages

38.    The Chellen Plaintiffs are entitled to recover lost wages, as well as compensatory and punitive damages under Title VII or § 1981, but not both. Initially, the Court notes that the analysis

---

[12]    In its proposed findings and conclusions, the EEOC discusses the invalidity of an employer's affirmative defense set forth in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Indus. v. Ellerth, 524 U.S. 742 (1998), to vicarious liability for an actionable hostile work environment created by a supervisor. As the defendants did not affirmatively plead the defense and do not attempt to assert in their proposed findings and conclusions that it is applicable, the Court does not address it.

under <u>Hoffman</u> for purposes of an FLSA claim does not change the analysis for purposes of a Title VII claim. <u>See</u> <u>Rivera v. NIBCO, Inc.</u>, 364 F.3d 1057, 1067-69 (9th Cir. 2004); <u>see also</u> <u>De La Rosa v. Northern Harvest Furniture</u>, 210 F.R.D. 237, 238-39 (C.D. Ill. 2002). Nor does it change the analysis for purposes of a § 1981 claim, as aliens are entitled to the protections of § 1981. <u>See</u>, <u>e.g.</u>, <u>Anderson v. Conboy</u>, 156 F.3d 167, 180 (2d Cir. 1998) (§1981 provides a claim against private discrimination on the basis of alienage); <u>Chacko v. Texas A&M Univ.</u>, 960 F. Supp. 1180, 1190-91 (S.D. Tex. 1997) (same).[13] The legal status and citizenship of the plaintiff employees, or the type of visas obtained for them by defendants and under which defendants required them to work, does not preclude the aggrieved individuals from recovering full and fair compensation for work actually performed, whether under the FLSA, Title VII, or § 1981.

### Compensatory Damages

39.     While the measure of damages under the FLSA may be minimum wage, under Title VII and § 1981, the measure of damages is the rate of pay that each Chellen plaintiff should have earned, given his skills and qualifications, compared to that of similarly-situated non-Indian JPC workers, less any applicable offsets.

> In the case of injury of an economic nature the injured party is to be placed as near as possible in the situation he would have been in had the wrong not occurred. Thus damages for the relevant period are to be determined by measuring the difference between plaintiff's actual earnings for the period and those which he would have earned absent the discrimination of defendants.

---

[13]     Again, the Court has not concluded that the Chellen plaintiffs were "illegal" or undocumented aliens, although, as holders of the B1 or B2 visas obtained for them by defendants, they were not authorized or eligible to be employed for wages in the United States.

T&S Serv. Assocs., Inc. v. Crenson, 666 F.2d 722, 728 (1st Cir. 1981) (internal quotations and

citations omitted); Taylor v. Philips Industries, Inc., 593 F.2d 783, 786 (7th Cir. 1979) (citations

omitted).  The Chellen plaintiffs have the burden of proving that they lost earnings as a result of

defendants' discrimination, see id., which they did.  However, the minimum wage measure of

damages for violations of the FLSA is subsumed in the calculation of lost wages under Title VII and

§ 1981.  To permit the recovery of compensatory damages under both FLSA and the civil rights

statutes would mean a double recovery for plaintiffs for the same harm.  However, the FLSA

liquidated damage award serves a different purpose and is not subsumed in the lost earnings portion

of the damages recoverable by the Chellen plaintiffs under Title VII and § 1981.

40.     In addition, compensatory damages are recoverable under § 1981 or Title VII for emotional

or mental harm.  See 42 U.S.C. § 1981a(b)(3); Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091,

1114-15 (10th Cir. 2001) (§ 1981 case); Atchley v. Nordam Group, Inc., 180 F.3d 1143, 1149-59

(10th Cir. 1999) (Title VII case); see also Bryant v. Aiken Regional Medical Centers Inc., 333 F.3d

536, 546-47 (4th Cir. 2003) (plaintiff alleged violation of both Title VII and § 1981).  Admittedly,

a precise calculation for this kind of damage is not easy.  "Emotional distress is an intangible

damage, and is an issue of fact which is within the province of the jury."  Canaday v. J.B. Hunt

Transport, Inc., 970 F.2d 710, 715 (10th Cir. 1992).

41.     "Most courts hold that emotional harm under § 1981 is presumed from the violation of the

constitutional right when plaintiff's testimony establishes humiliation or mental distress; specific

proof of out-of-pocket loss or medical testimony is not necessary." Charles R. Richey, 1 Manual on

Employment Discrimination and Civil Rights Actions § 4.34 (2d ed. 2003) (citations omitted). The

Tenth Circuit has held an award of emotional damages excessive where no treating physician or

58

psychologist testified, plaintiffs continued in their vocation, and the employer could not prevent insensitive remarks made toward plaintiffs. <u>Fitzgerald v. Mountain States Tel. and Tel. Co.</u>, 68 F.3d 1257, 1265-66 (10th Cir. 1995). However, the Tenth Circuit has stated that medical testimony is "one suggested method of proving emotional damages but is not the sole dispositive requirement." <u>Smith v. Northwest Financial Acceptance, Inc.</u>, 129 F.3d 1408, 1417 (10th Cir. 1997). The <u>Smith</u> court upheld a district court's denial of a motion for remittitur where an employee's testimony of emotional distress injury was corroborated by independent evidence but not medical testimony, and the employee did not continue to work in her chosen field after the discriminatory conduct. <u>Id.</u> at 1416-17.

42.   The Court concludes that compensatory damages for the Chellen plaintiffs' mental and emotional distress is appropriate. Although they were able to continue in their chosen professions after the discriminatory conduct and they offered no medical testimony as to the degree of distress they alleged suffered, their testimony and that of expert witness Florence Burke as to the hostile work environment created by defendants and the resultant humiliation, degradation, and loss of self-respect they experienced was both credible and compelling.[14]

### Punitive Damages

43.   Punitive damages are recoverable under Title VII if the plaintiff proves that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). In <u>Kolstad v. American Dental Assoc.</u>, 527 U.S. 526 (1999), the United States Supreme Court

---

[14]   However, the Court found that the "A" classification adequately compensates plaintiffs for these damages. <u>See</u> Finding of Fact ¶ 57, <u>supra</u>.

explained that the provision does not require egregious misconduct; instead, the appropriate inquiry is whether the employer engaged in the alleged conduct with the "knowledge that it may be acting in violation of federal law." Id. at 535; see Knowlton v. Teltrust Phones, Inc., 189 F.3d 1177, 1186 (10th Cir. 1999); EEOC v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1246 (10th Cir. 1999).  In other words, "an employer must at least discriminate in the face of a perceived risk that its action will violate federal law to be liable in punitive damages." Kolstad, 527 U.S. at 536.[15]  Because JPC employed more than 100 and fewer than 201 employees during the relevant time period, the sum of the amount of compensatory and the amount of punitive damages awarded may not exceed $100,000 per plaintiff.  42 U.S.C. § 1981a(b)(3)(B).

44.     Likewise, punitive damages are recoverable under § 1981 where a plaintiff proves "that the defendant acted with malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination." Guides, Ltd. v. Yarmouth Group Property Management, Inc., 295 F.3d 1065, 1077 (10th Cir. 2002); see Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1115-16 (10th Cir. 2001).  "The allowance of such damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore, the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of fact." Hampton, 247 F.3d at 1115 (quoting E.E.O.C.

---

[15]     The Kolstad court further held that "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's 'good-faith efforts to comply with Title VII.'" Id. at 545 (citation omitted).  The Tenth Circuit has also stated: "[E]mployer malice or reckless indifference in the failure to remedy or prevent a hostile or offensive work environment of which management-level employees knew or should have known is premised on direct liability, not derivative liability . . . ." Deters v. Equifax Credit Information Servs., Inc., 202 F.3d 1262, 1270 (10th Cir. 2000).  Although the EEOC raised the issue of vicarious liability, defendants do not dispute the liability of JPC if it is found in violation of Title VII.

v. Gaddis, 733 F.2d 1373, 1380 (10th Cir. 1984) (citation and internal quotation marks omitted)).

The standard of proof applicable to punitive damages claims under both Title VII and § 1981 is

preponderance of the evidence.  See Karnes v. SCI Colorado Funeral Servs., Inc., 162 F.3d 1077,

1081 (10th Cir. 1998).  The Court exercises its discretion to conclude that punitive damages are

appropriate in this case based upon the egregious conduct of defendants.

### Prejudgment Interest

45.     Prejudgment interest serves the purposes of Title VII, as it "helps to make victims of

discrimination whole and compensates them for the true cost of money damages they incurred."

Reed v. Mineta, 438 F.3d 1063, 1066 (10th Cir. 2006) (quoting E.E.O.C. v. Wilson Metal Casket

Co., 24 F.3d 836, 842 (6th Cir. 1994)).  That purpose is "limited, however, by recognition that

prejudgment interest does not accrue until the victim actually sustains monetary injury." Id. (finding

that employee's monetary injuries were incrementally inflicted from the date of his termination

through the entry of judgment as each pay period passed and employee went unpaid).  Courts have

routinely awarded prejudgment interest on backpay or lost past earnings and benefits in cases where

liability has been established on claims of discrimination under Title VII and/or § 1981.  E.g.,

Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1170 (6th Cir. 1996); Cooper v. Paychex,

Inc., 960 F. Supp. 966, 976 (E.D. Va. 1997); DuBose v. Boeing Co., 905 F. Supp. 953, 960 (D. Kan.

1995).

46.     Under Tenth Circuit law,

> an award of prejudgment interest under federal law is governed by a two-step
> analysis. First, the trial court must determine whether an award of prejudgment
> interest would serve to compensate the injured party. Second, when an award would
> serve a compensatory function, the court must still determine whether the equities
> would preclude the award of prejudgment interest.

U.S. Indus., Inc. v. Touche Ross & Co., 854 F.2d 1223, 1257 (10th Cir.1988), implied overruling on other grounds recognized by Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1231 (10th Cir.1996).  The Court concludes that an award of prejudgment interest would serve to compensate the Chellen plaintiffs for the true cost of money damages they incurred.  Further, the equities would not preclude the award of prejudgment interest although it has taken some time for this matter to be resolved through the judicial process.  The Court and the parties have worked, however, to move the case as expeditiously as possible.  Prejudgment interest on the amount awarded for defendants' violations of plaintiffs' civil rights is appropriate.

### Injunctive Relief

47.    The issue of injunctive relief is reserved for the Court pursuant to 42 U.S.C. § 12117(a), incorporating by reference Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5(g)(1).

> If the court finds that the [defendant] has intentionally engaged in an unlawful employment practice charged in the complaint, the court may enjoin the [defendant] from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but not be limited to reinstatement or hiring of employee . . . or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).  The Court has broad authority to construct appropriate equitable relief, both the remedy past discrimination and to prevent future discrimination.  Local 28 of Sheet Metal Workers' Intern. Assoc. v. EEOC, 478 U.S. 421, 446 (1986); Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 (1975).

48.    The Tenth Circuit has stated, in reviewing a district court's decision to deny injunctive relief for abuse of discretion, that "[t]he most important factor for a district court to  consider is whether the facts indicate a danger of future violations of the Act."  Roe v. Cheyenne Mountain Conference

Resort, Inc., 124 F.3d 1221, 1230 (10th Cir. 1987) (ADA claim); see EEOC v. Wal-Mart, Inc., 187

F.3d 1241, 1250 (10th Cir. 1999) (ADA claim).  To satisfy the Court that relief is needed, plaintiffs

must demonstrate that

> "there exists some cognizable danger of recurrent violation, something more than the
> mere possibility which serves to keep the case alive. The [district court's] decision
> is based on all the circumstances; [its] discretion is necessarily broad and a strong
> showing of abuse must be made to reverse it.  To be considered are the bona fides
> of the expressed intent to comply, the effectiveness of the discontinuance and, in
> some cases, the character of the past violations."

Roe, 124 F.3d at 1230) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953)); see

EEOC v. Wal-Mart, Inc., 187 F.3d 1241, 1250 (10th Cir. 1999).

49.     As set forth above, JPC ceased operations soon after the Chellen plaintiffs left the facility

and filed this lawsuit.  Nonetheless, the EEOC requests that the Court order directing defendants to

post a specific notice informing their employees of their employment rights and obligations under

federal law, and to provide contact information for the EEOC.  The EEOC also asks that such order

require defendants to train their employees regarding the applicable requirements of Title VII, and

in particular, requiring defendants to initiate a Title VII policy and complaint procedure to ensure

that their employees are aware of their rights and what to do if they feel they have experienced

discrimination.   Finally, the EEOC asks that defendants be enjoined from engaging in any

employment policy, practice or decision that deprives an applicant or employee of equal opportunity

on the basis of national origin.  However, the EEOC has failed to show anything more than a mere

possibility of recurrent violations given the complete cessation of operations by JPC.  The Court

concludes that injunctive relief is not warranted.

### State Law Tort Claims

#### Deceit

50.     Under Oklahoma law, deceit or fraud must be established by clear, satisfactory, and convincing evidence and requires a showing of: "1) a false material misrepresentation, 2) made as a positive assertion which is either known to be false, or made recklessly without knowledge of the truth, 3)  with the intention that it be acted upon, and 4) which is relied on by the other party to his/her own detriment." Rogers v. Meiser, 68 P.3d 967, 977 (Okla. 2003) (citation omitted).[16] "Prior similar dealings by the alleged wrongdoer may be considered in determining fraud." Silk v. Phillips Petroleum Co., 760 P.2d 174, 177 (Okla. 1988) (citing Cates v. Darland, 537 P.2d 336, 338 (Okla. 1975)).

51.     Defendants argue that John Pickle cannot be held personally liable on the Chellen plaintiff's deceit claim.  "A person cannot be liable for a fraudulent misrepresentation unless he made it himself or authorized another to make it for him or in some way participated therein." Occidental Life Ins. Co. v. Minton, 73 P.2d 440, 442 (Okla. 1937) (citation omitted).  As set forth in the Court's findings of fact, supra, John Pickle  personally met with the Chellen plaintiffs, individually, in India. While translators were present at both the individual and group meetings in India, many, if not all, of the plaintiffs could understand English and understood the promises being made by John Pickle individually.  He also personally reassured some of them Chellen plaintiffs, en route to the United

---

[16]     Fraud may be actual or constructive.  See generally Howell v. Texaco Inc., 112 P.3d 1154, 1161 (Okla. 2004); Patel v. OMH Medical Center, Inc., 987 P.2d 1185, 1199 (Okla. 1999). The elements set forth herein pertain to actual fraud only because the Chellen plaintiffs do not allege constructive fraud.

States, with regard to the misrepresentations upon which they relied. The Court concludes that John Pickle is personally liable on the Chellen plaintiffs' claim for deceit.

### False Imprisonment

52.      Under Oklahoma law, false imprisonment has been defined as "the unlawful restraint of an individual's personal liberty or freedom of locomotion," "the unlawful restraint by one person of the physical liberty of another,"and "[a]n act which directly or indirectly, is a legal cause of confinement of another within boundaries fixed by the actor for any time, no matter how short in duration . . . ." <u>S.H. Kress & Co. v. Bradshaw</u>, 99 P.2d 508, 511 (Okla. 1940) (citations and internal quotations omitted). The elements of the tort of false imprisonment are: "(1) the detention of a person against his or her will and (2) the unlawfulness of the detention." <u>Walters v. J.C. Penney Co., Inc.</u>, 82 P.3d 578, 583 (Okla. 2003); <u>S. H. Kress</u>, 99 P.2d at 512. False imprisonment "makes the actor liable to the other irrespective of whether harm is caused to any legally protected interest of the other, if the act is intended to confine the other or a third person, and the other is conscious of the confinement, and the confinement is not otherwise privileged." <u>S. H. Kress</u>, 99 P.2d at 511.

53.       The <u>S. H. Kress</u> court explained that "[f]alse imprisonment may be accomplished without actual arrest, assault, or imprisonment, and  may be committed by words alone or by acts alone, or by both." <u>Id.</u> at 512 (citations omitted); see <u>Mayo Hotel Co. v. Cooper</u>, 298 P.2d 443, 444-45 (Okla. 1956). Physical restraint is not necessary in order for the defendant's conduct to constitute false imprisonment. <u>Halliburton-Abbott Co. v. Hodge</u>, 44 P.2d 122, 125 (Okla. 1935). If a defendant's words and conduct induce in a plaintiff "a reasonable belief that resistance or physical attempts to escape . . . would be useless and futile, then it is nevertheless false imprisonment, regardless of the absence of physical restraint." <u>Id.</u> Further, a defendant cannot avoid liability for false imprisonment

if he believes the person allegedly confined is unaware of the means of escape or if the circumstances are such as to make the means of escape "offensive to a reasonable sense of decency or personal dignity." Restatement (Second) of Torts § 36 cmt. a (1965).

54.     "[A]ll who by direct act or indirect procurement, personally participate in, or proximately cause, the false imprisonment or unlawful detention or another are liable." Mayo Hotel Co., 298 P.2d at 445 (citing S. H. Kress, 99 P.2d at 514). The Court concludes that John Pickle is personally liable on the Chellen plaintiffs' claim for false imprisonment.

**Intentional Infliction of Emotional Distress**

55.     Under Oklahoma law, to recover for intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant acted intentionally or recklessly; (2) the Defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the plaintiff emotional distress; and (4) the emotional distress was severe." Estate of Trentadue ex. rel. Aguilar v. United States, 397 F.3d 840, 855-56 (10th Cir. 2005). The Trentadue case recently explained each of these elements in detail. While the actions of defendants' actions could be deemed intentional, the term "'recklessness' in the first element includes actions that are in 'deliberate disregard of a high degree of probability that the emotional distress will follow.'" Id. at Restatement (Second) of Torts § 46 cmt. i.

56.     The Trentadue court elaborated on the second element as follows:

> The second element of the tort requires proof that the tortfeasor's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Kraszewski v. Baptist Med. Ctr. of Okla., Inc., 916 P.2d 241, 248 n. 25 (Okla. 1996) (quoting Restatement (Second) of Torts § 46 cmt. d). Generally, the case is one where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id. at 249 n. 25. In addition, whether the tortfeasor's

conduct was extreme and outrageous must be considered in the setting in which the conduct occurred. Eddy v. Brown, 715 P.2d 74, 77 (Okla. 1986) (holding that nature of the conduct should not be considered in a sterile setting, detached from the milieu in which it took place); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1559 (10th Cir. 1995) (applying Oklahoma law and noting that court must focus on the totality of the circumstances).

397 F.3d at 856.

57.     "The third element of an emotional distress claim requires proof that the tortfeasor's conduct

caused the plaintiff's emotional distress." Id. (citing Computer Publ'n, [Inc. v. Welton,] 49 P.3d 732,

735 (Okla. 2002)).

58.     Finally, the fourth element requires proof that the plaintiff's emotional distress was "so severe that no reasonable [person] could be expected to endure it." Computer Publ'n, 49 P.3d at 736 (quoting Breeden [v. League Services Corp.], 575 P.2d [1374,] 1377 n. 6 [Okla. 1978]). While emotional distress includes "all highly unpleasant mental reactions," it is only where the emotional distress is extreme that liability arises. Miller v. Miller, 956 P.2d 887, 901 n. 44 (Okla.1998). "The intensity and the duration of the distress are factors to be considered in determining its severity." Breeden, 575 P.2d at 1378 n. 6 (quoting Restatement (Second) of Torts § 46 cmt. j). Moreover, although severe distress must be proved, "in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed." Id.

Trentadue, 397 F.3d at 856.[17]

59.     The tort of intentional infliction of emotional distress does not extend "to mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities." Eddy v. Brown, 715 P.2d

74, 77 (Okla. 1986) (quoting Restatement of Torts (Second), § 46, comment d).

---

[17]     The Trentadue court ultimately found that, although the plaintiffs had proven the first three elements of the tort, the district court had not make explicit findings as to severity of each individual plaintiff's emotional distress, and it remanded accordingly. 397 F.3d at 857-58. Since the parties here stipulated to representative witness testimony, the Court finds no need to determine the severity of the emotional distress for each of the Chellen plaintiffs.

### Personal Liability of John Pickle

60.     John Pickle is personally liable for the tortious acts he committed towards Chellen plaintiffs.

He cannot rely on the corporate shield of JPC to protect himself from liability.   Oklahoma law has

consistently recognized that an officer or director of a corporation may be held personally liable for

his torts "irrespective of whether the corporation for which he was acting was a tort-feasor or not

or whether the defendant was acting in its behalf as an agent." Garrett v. Meyers, 123 P.2d 965, 967

(Okla. 1942) (citing Rogers v.Brummet, 220 P.362 (Okla. 1923)).   Because the instant lawsuit

involves tort claims against John Pickle personally and is not merely an action to recover on a

corporate debt, neither the statutory nor the common law of Oklahoma shields him from liability.

Oklahoma Federated Gold & Numismatic, Inc. v. Blodgett, 24 F.3d 136, 141 (10th Cir. 1994)

("Under Oklahoma law, an officer may be held liable for the torts he personally commits."); see

Preston-Thomas Const., Inc. v. Central Leasing Corp., 518 P.2d 1125, 1217 (Okla. Ct. App. 1973).

The preponderance of the evidence at both the Phase I and Phase II trials establishes that John Pickle

directly participated in the creation and execution of the plan to bring the plaintiffs to Oklahoma,

including the misrepresentations made to them and the intentional infliction of emotional distress

they experienced.   The Court concludes that John Pickle is jointly and severally liable with JPC for

the damages awarded on the Chellen plaintiffs' tort claims.

### Prejudgment Interest

61.     Under Oklahoma law, prejudgment interest is mandated upon "a verdict for damages by

reason of personal injuries or injury to personal rights including, but not limited to, injury resulting

from bodily restraint, personal insult, defamation, invasion of privacy, injury to personal relations,

or detriment due to an act or omission of another . . . ."  Okla. Stat. tit. 12, § 727.1(E).   Damages

awarded for false imprisonment, a form of bodily restraint, would appear to warrant prejudgment interest under this statute. Similarly, prejudgment interest is appropriately awarded on damages for intentional infliction of emotional distress under § 727.1(E). See Timmons v. Royal Globe Ins. Co., 713 P.2d 589, 593 (Okla. 1985). Actions for fraud and deceit do not come within the purview of this section. See Rainbow Travel Serv. v. Hilton Hotels Corp., 896 F.2d 1233, 1243 (10th Cir. 1990); Sade v. Northern Nat. Gas Co., 501 F.2d 1003, 1006 (10th Cir. 1974).

62.     However, prejudgment interest may be awarded on damages for fraud and deceit under Okla. Stat. tit. 23, §§ 6, 7; see Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1317 (10th Cir. 1988). Okla. Stat. tit. 23, § 6 provides: "Any person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt." Id. Okla. Stat. tit. 23, § 7 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud or malice, interest may be given in the discretion of the jury." Id. The Court concludes that an award of prejudgment interest on each of the Chellen plaintiffs' state law tort claims is appropriate.

## SUMMARY

In summary, the EEOC has proven its civil rights claims against JPC for violation of Title VII and § 1981 based upon the disparate treatment afforded the Chellen plaintiffs and the hostile work environment created by JPC. The Chellen plaintiffs have established their claims against both defendants for violation of the FLSA and § 1981 as well as their tort claims for deceit, false

imprisonment, and intentional infliction of emotional distress.  All of the Chellen plaintiffs other than Mohammed Hassan Usman are entitled to relief.

The damages awarded to the Chellen plaintiffs jointly and severally against defendants JPC and John Pickle are:

- FLSA liquidated damages:[18]                                    $ 58,417.68

- Title VII /§ 1981[19]

  Compensatory damages:                                          607,006.85

  Punitive Damages:                                               52,000.00

- Deceit:

  Ten Months Promised Wages:                                    390,000.00

  Amounts Paid by Plaintiffs to AL Samit:                        82,056.00

- False Imprisonment                                             52,000.00

- Total                                                       $1,241,480.53

Counsel for the EEOC and Chellen plaintiffs are directed to determine appropriate apportionment of these amounts.  If counsel are unable to do so, United States Magistrate Judge Frank H. McCarthy is hereby appointed pursuant to Fed. R. Civ. P. 53 to act as a Special Master for apportionment and disbursement.  Counsel for the EEOC and Chellen plaintiffs are also directed to calculate the appropriate amount of prejudgment interest per these Findings of Fact and Conclusions

---

[18]    As concluded above, FLSA unpaid minimum wages are subsumed in the Title VII and § 1981 compensatory award.  See Conclusion of Law ¶ 39, supra.

[19]    As the EEOC brought its claim under Title VII and § 1981, the Court awards these damages jointly to the EEOC as well.

of Law, and to submit a proposed form of judgment, approved as to form by counsel for defendants,

within 30 days of this date.

       **IT IS SO ORDERED** this 24th day of May, 2006.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT

VACATED